# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

`

| | |
|---|---|
| GARY CHRISTIAN, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )      Civil Action No. 07-1607 (RMU) |
| | ) |
| PHILIP MANGANO, | ) |
| Executive Director | ) |
| U.S. Interagency Council on Homelessnes | ) |
| Defendant. | ) |
| _____ | ) |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56, Defendant Philip Mangano, in his official capacity as Executive Director, United States Interagency Council on Homelessness, moves the Court for summary judgment on the grounds that no genuine issue of material fact exists and Defendant is entitled to judgment as a matter of law. In support, Defendant submits a Statement of Material Facts Not in Dispute, a Memorandum of Points and Authorities, accompanying documents, and a proposed order.[1]

Respectfully submitted,

/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

---

[1]      Plaintiff should take notice that any factual assertions contained in the accompanying declarations and other attachments in support of Defendants' motion may be accepted by the Court as true unless Plaintiff controverts them with his own affidavit or other documentary evidence. See Neal v. Kelly, 963 F.2d 453 (D.C. Cir. 1992); LCvR 7.1; and Fed. R. Civ. P. 56(e).

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

`

| | |
|---|---|
| GARY CHRISTIAN, | ) |
| | ) |
|     Plaintiff | ) |
| | ) |
|         v. | )       Civil Action No. 07-1607 (RMU) |
| | ) |
| PHILIP MANGANO, | ) |
| Executive Director | ) |
| U.S. Interagency Council on Homelessnes | ) |
|     Defendant. | ) |
| _____ | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
## OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant moves for summary judgment. Plaintiff claims that because of his race (Caucasian) and religion (Catholic) his job title as Program Analyst and duties were taken from him. Plaintiff also claims that he was constructively discharged from his job. Plaintiff is incorrect. Defendant had legitimate, non-discriminatory reasons for changing his job duties that were not motivated by discrimination. Also, Plaintiff voluntarily resigned from his job. Thus, summary judgment should be granted for Defendant.

## FACTUAL BACKGROUND

Defendant adopts its Statement of Material Facts not in Genuine Dispute.

## ARGUMENT

## I.   Legal Standards

### A.   Summary Judgment

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Celotex Corp. v.</u>

<u>Catrett</u>, 477 U.S. 317, 322 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,

587 (1986).  The Court must view all facts, and reasonable inferences to be drawn from them, in a

light most favorable to the non-moving party, in determining whether there exists a genuine issue

of material fact  <u>Anderson</u>, 477 U.S. at 255.  If the evidence favoring the non-moving party is

"merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Id</u>. at 249-

50.  The mere existence of some factual dispute is insufficient to withstand summary judgment; there

must be a genuine issue of material fact.  <u>Id</u>. at 247-48.

    Rule 56 does not require the moving party to negate the non-movant's claim or to show the

absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.  Rather, when the movant files

a properly-supported summary judgment motion, the burden shifts to the nonmoving party to show

"specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The

non-movant cannot manufacture genuine issues of material fact with "some metaphysical doubt as

to the material facts,"  <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586, or with "conclusory

allegations," "unsubstantiated assertions,""or by only a 'scintilla' of evidence." <u>Little v. Liquid Air</u>

<u>Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994).  <u>See</u> <u>also</u> <u>Brown v. Small</u>, 2006 WL 1888562 at *4

(D.D.C. July 7, 2006) (RBW).

B    **Title VII Discrimination Claims**

    In <u>Fogg v. Gonzales</u>, 492 F.3d 447 (D.C. Cir. 2007), the D.C. Circuit held, <u>inter</u> <u>alia</u>, that the

1991 amendments to Title VII codified two alternative ways of establishing liability for intentional

discrimination: (1) a single motive theory requiring that the plaintiff establish that discrimination was

the "sole" or "but for" reason for the challenged employment action; and (2) a "mixed-motive"

theory requiring only that the plaintiff demonstrate that discrimination played a "motivating part" or was a "substantial factor" in the employment decision. Id. at 451. Under either theory, plaintiff must demonstrate discrimination by a preponderance of the evidence[1] and may rely on direct or circumstantial evidence to meet that burden. Desert Palace, Inc. v. Costa, 539 U.S. 90, 92-102 (2003).

In the absence of direct evidence, Plaintiff may attempt to establish that he was the victim of intentional discrimination on the basis of his race and religion by relying on circumstantial evidence analyzed using the scheme first set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).[2] Under that scheme, the plaintiff must first, by a preponderance of the evidence, establish a prima facie case of discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). If the employee succeeds, the employer then must introduce evidence of a legitimate, nondiscriminatory reason for its action. See McDonnell Douglas, 411 U.S. at 802. Once it is established that both parties have met their respective burdens of production (i.e., plaintiff by presenting a prima facie case and defendant by producing a non-discriminatory reason for its actions), the burden shifting scheme becomes irrelevant. Hicks, 509 U.S. at 510. Then, the plaintiff must establish, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice." Desert Palace, Inc. v. Costa, 539 U.S. 90,

---

[1]    "Preponderance of the evidence" means such evidence as, when weighed against that opposing it, has the more convincing force that something is so. Hopkins v. Price Waterhouse, 737 F. Supp. 1202 (D.D.C. 1990), aff'd 920 F.2d 967 (D.C. Cir. 1990); Metropolitan Stevedore Company v. Rambo, 521 U.S. 121, 137 n.9 (1997). "[W]hen the evidence is evenly balanced, the [party with the burden of persuasion] must lose." Id.

[2]    Reliance on the McDonnell Douglas scheme for testing the viability of plaintiff's circumstantial evidence is not limited to the "single-motive" theory of liability. See Fogg v. Gonzales, 492 F.3d 447, 451 n.*

3

101 (2003) (citing 42 U.S.C. § 2000e-2(m)).

Alternatively, plaintiff can meet the ultimate burden by demonstrating that the defendant's legitimate, non-discriminatory reason is a pretext and that discrimination is the "but for" reason for the challenged employment action. St. Mary's Honor Center, 509 U.S. at 515-518. This is a more difficult standard than the requirement under Section 2000e-2(m) to show that discrimination was a motivating factor. In the single motive case Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000), Justice O'Connor recognized occasions where summary judgment would be appropriate:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Whichever standard is employed, plaintiff fails to meet his burden of coming forward with evidence to create a triable issue. As demonstrated below, the undisputed facts illustrate that plaintiff can not establish that discrimination was a motivating factor, much less that it was the sole motivating factor in the challenged decision.

## C.    No adverse Action

To establish a prima facie case of disparate treatment under Title VII, a plaintiff must show that 1) he is a member of a protected class; 2) he suffered an adverse employment action; and 3) he was treated differently from similarly-situated employees outside the protected class. Childers v.

Slater, 44 F. Supp.2d 8, 18 (D.D.C. 1999), vacated in part on other grounds, 197 F.R.D. 185, 191

(D.D.C. 2000).  Because Plaintiff did not suffer an adverse employment action, summary judgment

must be granted.

  To establish an adverse employment action in the absence of a diminution in pay or benefits,

a plaintiff must show an action with "materially adverse consequences affecting the terms,

conditions, or privileges of employment."  Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999)[3];

see also Russell v. Principi, 257 F.3d 815 818 (D.C. Cir. 2001) (recognizing "the 'objective tangible

harm' requirement, which guards against both judicial micro management of business practices, and

frivolous suits over insignificant slights") (internal quotation omitted).  As noted in Brown, "[m]ere

idiosyncrasies of personal preference are not sufficient to create an injury." Id.; see also Russell,

supra, 257 F.3d at 818 ("while adverse employment actions extend beyond readily quantifiable

losses, not everything that makes an employee unhappy is an actionable adverse action.  Minor and

even trival employment actions that an irritable, chip-on-the-shoulder employee did not like would

otherwise form the basis of a discrimination suit.") (internal quotations omitted).

  Other than a change in job title and work assignments Plaintiff cannot show a reduction in

salary or an increase in work hours.  When Plaintiff joined USICH in 2003,  his title was Program

Analyst with the duties of  (1) managing the Executive Director's travel and hotel arrangements, (2)

preparing the Executive Director's speeches, (3) keeping the Executive Director's calendar, and (4)

performing research as needed (Exhibit 1 -Christian Aff. at 2).  In the fall of 2005, after USICH had

---

[3] The concept is similar to that of the "tangible employment action," which requires a showing of a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Brody, supra, 199 F.3d at 456 (citing Burlington Industries, Inc. V. Ellerth, 524 U.S. 742, 761 (1998).

become a separate entity from HUD, Plaintiff's title changed to Staff Assistant with the duties of (1) reorganizing the files on the general drive, (2) organizing and tabbing the file folders, (3) developing a filing project spreadsheet, (4) beginning a drive project plan, and (5) working on award summaries (Exhibit 4 - Christian Dep. at 25-27).  Management changed Plaintiff's title and duties because Plaintiff's skills were needed for the agency's new computer systems which required the computer's general drive and agency files to be organized (Exhibit 4 - Christian Dep. at 24-25 ; Exhibit 2 - Hombs Aff at 2- 3).  See Mungin v. Katten Muchin & Davis, 116 F.3d 1549, 1557 (D.C. Cir. 1997) where the Court found that, "changes in assignment or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes." Compare Childers, supra, 44 F. Supp.2d at 19; ("Mere . . . alteration of job responsibilities will not rise to the level of adverse action");(Cindy v. Liberty National Trust Co. Of Ind., 993 F.2d 132, 136 (7th Cir. 1993) ("a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities")(cited with approval in Forkkio v. Tanoue, 131 F. Supp. 2d 36, 40 (D.D.C. 2001).  Because Plaintiff can not establish an adverse employment action there is no prima facie case of discrimination.

**C.     Legitimate reasons for changing Plaintiff's Job Title and Duties**

Assuming Plaintiff can establish a prima facie case of discrimination, Defendant had legitimate and nondiscriminatory reasons for changing Plaintiff's job title and duties.  A defendant's burden of legitimate, nondiscriminatory reason is a de minimis one. See e.g., Randall v. Howard Univ., 941 F. Supp. 206, 211 (D.D.C. 1996), aff'd, 132 F.3d 1482 (D.C. Cir. 1997); Phillips v. Holladay Property Services, Inc., 937 F. Supp. 32, 35 (D.D.C. 1996).  An employer's actions can be based on any reason, or no reason at all, as long as the reason is not attributable to Plaintiff's

protected status. <u>Weigert v. Georgetown University</u>, 120 F. Supp. 2d 1, 20 (D.D.C. 2000) (citing

<u>Mesnick v. General Electric Co.</u>, 950 F.2d 816, 823 (1st Cir. 1991), cert. denied, 504 U.S. 985

(1992).

Here, when Plaintiff joined the USICH, he was a Program Analyst whose duties included

managing the Executive Director's travel and hotel arrangements, preparing the Executive Director's

speeches, keeping the Executive Director's calendar, and performing research (Exhibit 1- Christian

Aff. at 2).   In fiscal year 2004, however, USICH had to begin preparations to relocate from the

Department of Housing and Urban Development (HUD) office space and into another building, and

begin operating as an independent agency from HUD (Exhibit 2- Hombs Aff. at 2-3).   As a result,

USICH management had to make decisions about its operations including staff by deciding  which

positions to fill and which positions to eliminate.   <u>Id</u>. at 2-4.   Furthermore, USICH, as an

independent agency, would have new Information Technology (IT) equipment available to it.   <u>Id</u>.

Management considered Plaintiff as highly organized and someone who executed assignments

without prompting <u>Id</u>. at 3.   Plaintiff had a background in IT marketing.(Exhibit 4 - October 4, 2006

Deposition of Gary Christian "Christian Dep" at 51 ).   Management officials concluded that Plaintiff

could best be utilized in a new and different capacity including assigning him the task of electronic

filing  (Exhibit 5 - Franklin Aff.at 3; Exhibit 2- Hombs Aff. at 3) .   In November of 2005, Plaintiff's

job title was changed to Staff Assistant with duties of reorganizing the files on the general drive,

organizing and tabbing the file folders, developing a filing project spreadsheet, and working on

award summaries (Exhibit 4 -Christian Dep. at 25-27).   When USICH moved to new office space,

it acquired new computer servers, and Plaintiff had the opportunity to organize the computer's

general drive and other agency files. (Exhibit 4 -Christian Dep. at 24-25).  An employer may transfer

an employee, remove his duties, or give him an unsatisfactory performance rating, provided the employer has a legitimate reason for doing so.  See Jones v. Lyng, 669 F. Supp. 1108, 1122 (D.D.C. 1986). Hence, Plaintiff's job title and duties changed to meet the electronic and IT needs of USICH, and not because of any discriminatory reasons.

Plaintiff must rebut Defendant's reasons by presenting sufficient evidence such that a reasonable fact finder could conclude that the "proffered reason is but a pretext for discrimination." Paquin v. Fed. Nat'l Mortgage Ass'n, 119 F.3d 23, 27-28 (D.C. Cir. 1997).  Plaintiff can not demonstrate that Defendant was motivated by race.  Plaintiff admits that, after November 23, 2005, while serving as a Staff Assistant, he, along with other coworkers, continued to prepare the Executive Director's speeches (Exhibit 4 - Christian Dep. at 21-22).  After November 23, 2005, the duty of preparing the briefing materials previously performed by Plaintiff as a Program Analyst, was performed by someone of the same race as Plaintiff, William Thomas, Caucasian (Id. at 37).

Plaintiff can not demonstrate the Defendant was motivated by religion. Plaintiff admits that the only evidence he has to support his claim that "Ms. Miller was put in the position because of her being the same race, black, and faith as Mr. Franklin," is Plaintiff's observations that Mr. Franklin and Ms. Miller's day-to-day interaction, which included them having lunch together in the lunch room and conversing together.  (Id. at 15-16, 30-32, 42).   In fact, Plaintiff did not know Mr. Franklin's and Ms. Miller's religion other than being "saved." As previously stated, an employer's actions can be based on any reason, or no reason at all, as long as the reason is not attributable to Plaintiff's protected status.  Weigert , 120 F. Supp. 2d at 20.  Plaintiff can not show the Defendant's business reasons were a pretext for discrimination.  Finally, "[i]t is well-settled . . . that courts cannot permit themselves to be used as 'super-personnel department[s] that reexamined [ ] an

8

entity's business decision[s]." <u>Brown v. Small</u>, 437 F. Supp.2d 125, 132 (D.D.C 2006)

**D.    No Constructive Discharge**

Plaintiff also claims that he was constructively discharged from his federal job because, among other things, he had nothing to do at work, he was looked at by other staff members, he was rarely spoken to, and he was excluded from staff meetings which led to health problems causing him to resign (Complaint at 5-6). To the contrary, Plaintiff was not constructively discharged from his employment. Constructive discharge is :

> when an employee quits his position due to working conditions that are not only 'merely intolerable' but also 'intolerable in a discriminatory way.' Constructive discharge thus requires a finding of discrimination and the existence of certain 'aggravating factors.' These 'aggravating factors' are those things that would force an employee to leave. The inquiry focuses on whether the employer creates or condones discriminatory working conditions that would drive a reasonable person to resign. Moreover, a finding of intentional discrimination is a necessary predicate for a finding of constructive discharge.

<u>Hendrick v. Paulson</u>, 520 F. Supp.2d 65, 100 (D.D.C. 2007) (citations omitted).

Plaintiff's claim fails because Defendant neither intentionally discriminated against Plaintiff nor created or condoned discriminatory working conditions that would cause a reasonable person to resign. Plaintiff described his job situation as "unbearable" that "severely affected his health" (Exhibit 4 - Christian Dep. at 53-54). Plaintiff stated that he had no contact with anyone in the office, and he had lost respect for his supervisor who Plaintiff felt treated him like a child (Id.). Because of these feelings, Plaintiff refused to attend a meeting with Mr. Franklin (Id.). As uncomfortable as Plaintiff may have felt in the workplace none of the factors he described would have caused a reasonable person to resign. The district court in <u>Kalinoski v. Gutierrez</u>, 435 F. Supp. 2d 55, 78 ( D.D.C. 2006) found that constructive discharge:

does not apply to a case in which an employee decides to resign or retire because he does not want to accept a new assignment, a transfer, or other measures that the agency is authorized to adopt, even if those measures make continuation in the job so unpleasant for the employee that he feels that he has no realistic option but to leave.... [T]he fact that an employee is faced with an unpleasant situation or that his choice is limited to two unattractive options does not make the employee's decision any less voluntary.

Furthermore, Plaintiff's health issues are not a basis for constructive discharge.  An employee's decision to quit out of concern for his health is considered voluntary and not a constructive discharge. Id. at 78 (citing  Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir.1993) "[T]he fact that an employee develops stress-related ill health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer.")( See also Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1136 n.7 (10th Cir. 2004), "the fact that  a plaintiff subjectively considers his or her workplace stressful and may have suffered personal health problems as a result is not an objective criterion used to determine if a reasonable employee would have been compelled to resign").  In sum, Plaintiff voluntarily resigned from federal service and was not constructively discharged.

10

## **Conclusion**

For the above stated reasons, summary judgment should be granted for Defendant.

Respectfully submitted,

/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/_____
BLANCHE L. BRUCE, D.C. BAR # 960245
Assistant United States Attorney

Of Counsel
Allen Phaup
GSA

11

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing <u>Motion, Statement of Facts,</u> <u>Memorandum of Law and Order</u> was made by first class, postage prepaid mail, this 13th day of March 2008 to:

Gary Christian
400 Walnut Grove
Washington, West Virginia 26181


/s/_____
Blanche L. Bruce
Assistant United States Attorney

/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/_____
BLANCHE L. BRUCE, D.C. BAR # 960245
Assistant United States Attorney
555 Fourth Street, N.W., Room E-4220
Washington, D.C. 20530
(202) 307-6078

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

`

| | |
|---|---|
| **GARY CHRISTIAN,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | **Civil Action No. 07-1607 (RMU)** |
| ) | |
| **PHILIP MANGANO,** ) | |
| **Executive Director** ) | |
| **U.S. Interagency Council on Homelessnes** ) | |
| **Defendant.** ) | |
| _____ ) | |

## STATEMENT OF MATERIAL FACTS NOT IN GENUINE ISSUE

Pursuant to LCvR7.1(h), Defendant Philip Mangano, in his official capacity as Executive Director, U.S. Interagency Council on Homelessness (USICH) submits this statement of material facts as to which there is no genuine dispute.

1.     Plaintiff began a temporary appointment with USICH in late fall of 2003. (Exhibit 1 - Affidavit of Gary Christian "Christian Aff." at 1; Exhibit 2 - Affidavit of Mary Ellen Hombs "Hombs Aff." at 1 ).

2.     Plaintiff served a series of temporary appointments with USICH which were continuously extended. (Exhibit 3- SF-50s).

3.     Plaintiff's most recent temporary appointment was not to exceed October 1, 2006. Id.

4.    In fiscal year 2004, USICH had to relocate to new office space and operate as an independent agency as directed by Congress. (Exhibit 2 - Homb Aff. at 2-3).

5.    USICH management spent the summer preparing ideas as to how to realign its staff and operations because the agency was moving out of the Department of Housing and Urban Development ('HUD") building and it could no longer rely on HUD for supplies and other support functions.  Id. at 2-4.

6.    USICH management also analyzed what positions had to be filled and which positions were not needed. Id.

7.    USICH management determined that new Information Technology (IT) allowed some agency functions to be handled electronically thereby eliminating some paper functions Id.

8.    Plaintiff has a background in IT marketing (Exhibit 4 - October 4, 2006 Deposition of Gary Christian "Christian Dep" at 51 ).

9.    USICH management considered changes to Plaintiff's duties and job title and assigned him, among other things, the task of electronic filing (Exhibit 5 -Affidavit of Darren Franklin  "Franklin Aff." at 3; Exhibit 2 - Hombs Aff. at 2-4).

10.    USICH moved to new offices in late September 2005 (Exhibit 2 - Hombs Aff. at 2).  USICH acquired new computer servers which required the computer's general drive and agency files to be organized  (Exhibit 4 - Christian Dep. at  24-25).

11.    Plaintiff's job title was Program Analyst until November 23, 2005, and Plaintiff was the only Program Analyst in his unit. (Exhibit 1 - Christian Aff. at 2-3).

12.    As Program Analyst, Plaintiff's duties included: (1) managing the Executive Director's travel and hotel arrangements, (2) preparing the Executive Director's speeches, (3)

keeping the Executive Director's calendar, and (4) performing research as needed (Exhibit 1 - Christian Aff. at 2).

13.    Plaintiff's job duties changed when USICH became an independent agency from HUD (Exhibit 2 - Hombs Aff. at 3; Exhibit 4 - Franklin Aff. at 3).

14.    On November 23, 2005, Darren Franklin, (African-American/Baptist) Plaintiff's first-level supervisor, informed Plaintiff that he would no longer be working as a Program Analyst but as Staff Assistant. (Exhibit 1 Christian Aff. at 3; Exhibit 5 - Franklin Aff. at 2).

15.    After November 23, 2005, there were three Staff Assistants, including Plaintiff and no Program Analysts (Exhibit 5 - Franklin Aff at 2).

16.    The Staff Assistants were Plaintiff, Stacy Pickstock (AfricanAmerican/Nondenominational), and William Thomas (Caucasian/no religious affiliation). Id.

17.    As a Staff Assistant, Plaintiff's duties included: (1) reorganizing the files on the general drive, (2) organizing and tabbing the file folders, (3) developing a filing project spreadsheet, (4) beginning a drive project plan, and (5) working on award summaries (Exhibit 4 - Christian Dep. at 25-27).

18.    Mr. Franklin, Ms. Mary Ellen Hombs, and Mr. Philip Mangano, all decided that Plaintiff could be better utilized in a new and different capacity (Exhibit 2 - Hombs Aff at at 3).

19.    After November 23, 2005, Cynthia Miller (African-American/Apostolic) was assigned some of the duties that were previously performed by Plaintiff including managing the Executive Director's travel and hotel arrangements and keeping the calendar (Exhibit 6 - Cynthia Miller Affidavit "Miller Aff." at 2).

20.    After November 23, 2005, Plaintiff and coworkers continued to prepare the Executive Director's speeches. (Exhibit 4 - Christian Dep. at 21-22).

21.    After November 23, 2005, Ms. Miller and other co-workers handled research Id. at 22-23.

22.    After November 23, 2005, Mr. William Thomas, a Caucasian, prepared briefing materials which had previously been handled by Plaintiff.  Id. at 37.

23.    Plaintiff does not know what duties his co-workers were performing, other than what Stacy Pickstock told him. Id. at 23-24.

24.    Plaintiff resigned from USICH on or around July 3, 2006 (Complaint at page 5).

25.    Plaintiff admits that the only evidence he has to support his claim that "Ms. Miller was put in the position because of her being the same race, black, and faith as Mr. Franklin" is his observations of Mr. Franklin and Ms. Miller's day-to-day interaction, which included them having lunch together in the lunch room and conversing together (Exhibit 4 - Christian Dep. Id. at 30-32).

26.    On or around July 3, 2006, Plaintiff resigned.  The situation that Plaintiff felt was so intolerable was going to work and sitting in an office having absolutely no contact with anyone in the office, and the fact that Mr. Franklin wanted to meet with Plaintiff about his job duties in mid-June.  Id. at 54.  Plaintiff felt that a meeting with Mr. Franklin was unbearable because Mr. Franklin treated him like a child and Plaintiff had lost respect for Mr. Franklin; therefore Plaintiff did not meet with Mr. Franklin. Id. at 54-55.  Plaintiff claims he could not deal with what he characterized as the "unbearable situation" of being around people that disliked him for no reason. Id. at 56.  Plaintiff also asserts that there came a time when Mr. Franklin also was not speaking to William Thomas, a Caucasian. Id. at 23.

4

Respectfully submitted,

/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
 United States Attorney


 /s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
 Assistant United States Attorney


 /s/_____
BLANCHE L. BRUCE, D.C. BAR # 960245
Assistant United States Attorney
555 Fourth Street, N.W., Room E-4220
Washington, D.C. 20530
(202) 307-6078

5

Exhibit 1

**AFFIDAVIT**

Location: Washington, D.C.

I, Gary E. Christian, solemnly swear to the truth of the following statement which is in response to questions posed by Robert Walker, Equal Employment Opportunity (EEO) Investigator, F & W Associates, and provides information pertaining to the formal complaint of discrimination, filed by me, Gary E. Christian, against the U. S. Interagency Council on Homelessness, Complaint Number 06-NCR-WAL-GEC-1. The following claim has been accepted for investigation:

Whether I was subjected to discrimination based on my race (Caucasian) and religion (Catholic) when on November 23, 2005:

I was relinquished from my job duties and was replaced by a contract/temporary employee.

My name is Gary E. Christian. I am Caucasian, and my religion is Catholic. As of November 23, 2005, my title has been Staff Assistant, GS - 12. Prior to November 23, 2005, my title was Program Analyst GS -0343-12. I had held the Program Analyst position from February 2003 until November 23, 2005. I work for the U.S. Interagency Council on Homelessness, Federal Center Southwest, 409 3rd Street, S. W., Suite 310, Washington, D. C. 20024. The Agency moved to this location in September 2005. I have been here since that time.

My first-level supervisor is Darren Franklin. Prior to November 23, 2005, my

supervisor was Philip Mangano, Executive Director. I do not have a second-level supervisor.

The management official responsible for the decision about which I complain is Darren Franklin, Office Administrator. Mr. Darren Franklin is Black and his religion is other than Catholic. He states that his religion is "Saved."

The duties that I performed as a Program Analyst were taken from me as of November 23, 2005. As a Program Analyst, I managed the Executive Director's travel and hotel arrangements, prepared his speeches, kept his calendar, and did research as he needed it done. Although I was not officially demoted, I now do not have any real job. I sit in the office until someone has something for me to do. I do whatever Darren tells me to do, e.g., filing.

I was the only Program Analyst in my unit. I had never asked that my duties be taken away from me. I was removed from my job duties, entirely without explanation as to why Cynthia Miller, Contract Employee, would be in that role in place of me. There was no reorganization or other agency-wide personnel action that caused Mr. Franklin to remove me from my duties. To my knowledge, no other employees had their titles or duties changed. I believe Ms. Miller was put in the position because of her being of the same race (Black) and faith as Mr. Franklin. After the decision, she has not shown any better ability to handle the job than I did. The decision to give her my duties was not based on past experience, seniority, or merit.

*A.C.*

On or about October 2005, Mr. Franklin and Deputy Director Mary Ellen Hombs met with Cynthia Miller and me and informed me that due to the added burden put on me to prepare Travel Authorizations, Mr. William Thomas (Caucasian, religion unknown) would begin preparing briefing materials for the executive director and that Cynthia would be managing the public calendar that is accessible by everyone in the office.

On November 23, 2005 Mr. Franklin called me into his office just prior to the staff being released early for the Thanksgiving holiday and informed me that I would no longer be working in my current position and handed me a new job description for Staff Assistant. I asked Mr. Franklin who would be handling my job and he told me that Cynthia Miller would be in that position beginning immediately. There was no explanation given or offered.

I feel as if I have been fired, but not officially terminated. I do not have any real job. I sit in the office until someone has something for me to do. Although my pay was not decreased, I believe that since my duties have been taken away, I have been demoted.

For the reasons stated above, I feel that my race (Caucasian) and religion (Catholic) were the reasons for this employment decision. I believe that religion was the principal basis for removing my duties. I believe that because Mr. Franklin has made it clear that he and Cynthia Miller are "saved."

Because of the decision to relieve me from my duties, I have been put in a position where I am uncomfortable and have to seek a new position outside of the agency. The fact is that no one since November 2005 has given me any explanation as to why I was relieved from my duties. My colleagues have asked why an e-mail was not sent out explaining the change.

For relief I am seeking one year's salary as settlement plus attorney's fees.

I have read this statement consisting of 4 pages, and I have made all the necessary changes, additions or corrections, and I have signed or initialed every page.

I hereby declare under penalty or perjury that the foregoing statement is true, correct, and complete to the best of my knowledge and belief.

Signature: _____

Date: _04/06/06_____

Subscribed and sworn to before me this ___ day of _____ 2006

_____

EEO Investigator, F & W Associates

Or

_____

Notary Public

My commission expires:_____

Exhibit 2

1
2                                    **AFFIDAVIT**
3                                                          Location: Washington, D.C.
4
5          I, Mary Ellen Hombs, solemnly swear to the truth of the following statement

6    which is in response to questions posed by Robert Walker, Equal Employment

7    Opportunity (EEO) Investigator, F & W Associates, and provides information

8    pertaining to the formal complaint of discrimination, filed by Gary Christian, against

9    the U. S. Interagency Council on Homelessness, Complaint Number 06-NCR-WAL-

10   GEC-1.  The following claim has been accepted for investigation:

11
12               Whether he was subjected to discrimination based on his race (Caucasian) and
13               religion (Catholic) when on November 23, 2005:
14
15               He relinquished his job duties and was replaced by a contract/ employee.
16

17          My name is Mary Ellen Hombs.  My race is Caucasian, and my religion is

18   Episcopalian.  I work in the U.S. Interagency Council on Homelessness, Federal Center

19   Southwest, 409 3rd Street, S. W., Suite 310, Washington, D. C.  20024.  My title is Deputy

20   Director, grade equivalent is GS - 15, step 8.  I have been in this position for about 3 years.

21   I have worked for USICH since September 2003, and at this duty station since about September

22   15, 2005.

23          My first-level supervisor is Philip Mangano, Executive Director.  I do not have a second-

24   level supervisor.

25          Gary came to the agency in late fall 2003, as a temporary worker.  I did not work with

26   him very much at first; he performed general administrative work for the agency.  His

Initials _____          Page 1 of 5

1    performance was very good, and he executed assignments quickly.  We were trying to staff up a

2    fairly new agency, so we offered him a position as a full time employee, which he accepted.

3         From the time that I came aboard as Deputy, we have been taking a number of steps to

4    ensure the agency has a complete complement of staff since we had a full agenda for the agency.

5    We took steps to determine what would best meet the needs of a Director who travels a great

6    deal and to meet the general staffing needs for day-to-day operations.  During fiscal year 2004

7    we had a rolling timeline to relocate our agency to independent space, as directed by the

8    Congress; there was substantial delay in implementing the move.  We identified needs in the

9    agency - our own IT operations as well as setting up our staffing pattern  - as we wanted to have

10   it in the future.  We spent a fair amount of time during the summer of 2004 preparing ideas of

11   how to align our staffing and operations once we were entirely on our own.  As we approached

12   the end of summer 2005 and prepared to move, we looked at what roles we had to fill and which

13   were no longer necessary.  We also had a budget increase to our appropriation and wanted to

14   determine how to best use it.  As a part of our analysis, we were going to have new tools

15   available to handle IT some functions.  The new IT was going to allow us to handle some

16   functions electronically instead of a paper process.  It was clearer at that point what resources we

17   needed to handle the needs of the Executive Director and our administrative responsibilities.  As

18   a part of that review, we looked at some changes to Gary's duties and his title.  We moved in late

19   September 2005, and a number of people were doing a number of extra things to support the

20   move. By around Thanksgiving of 2005, we were clear of that change, and we were heading in

21   the new direction.

22        I disagree with Gary's statement that he had nothing to do after the change in his duties.

Initials                               Page 2 of 5

1    In redirecting what his time would be spent on, we considered what level of work he was capable

2    of and what unique skill he has.  He is highly organized and executes assignments without much

3    prompting.  When we moved, we had several projects that needed his kind of attention.  Some

4    examples follow.  We were created in 1987, but were dormant until we were brought back on line

5    in 2002 and were to become a fully independent agency.  There is actually a paper archive of the

6    agency from the prior era.  One end of our office space was dedicated to storing moving boxes

7    that contained those materials, which are the full history of our agency.  The Council had to

8    develop a system to handle those materials and to retrieve materials.  Two weeks ago, we did a

9    Senate hearing.  I needed documents from the past using some of that material.  Gary was also

10   asked to look at the organization of our folders on our hard drive system.  Because it is new, we

11   can go in a number of directions in terms of standardizing our ongoing files and electronic

12   archive.  That is an area that we tasked him with going through methodically to reorganize things

13   according to principles that Darren and I had developed.  We reviewed that with Gary.  He also

14   was moved out of open office space into an office of his own.

15       Changes were agreed upon in a collaborative process that included the Executive

16   Director's input about whether he (the Director) was getting the support that he needed, and

17   whether we were moving in the direction that he wanted.  His style is to give the lead person the

18   room to make proposals.

19       I don't recall the process to reorganize roles as one where Darren brought me a set of

20   proposals, but rather it was that we collectively had a set of issues on which we collaborated with

21   the Director to ensure the outcome that we wanted.  The assessment involved a review of all

22   needs of the office.  For example, we gave up a number of support functions when we left the

Initials           Page 3 of 5

1    HUD building. At HUD, when the printer ran out of ink, you called a number, and it was

2    replaced sometime that day. After the move, we were responsible for purchasing the supplies,

3    inventorying equipment, or whatever we needed and all of the other administrative tasks that had

4    to be performed. We had to decide how to absorb and accomplish a myriad of responsibilities

5    like this, not just look at Gary's position.

6         Neither Mr. Christian's race nor religion was a factor in the decision to change his title

7    and duties. I was not aware of his religion until I received the paper work related to his

8    complaint.

9         Gary was and is someone that has concrete skills that I think we have used well. He has

10    made contributions in both of his roles.

1       I have read this statement consisting of **5** pages, and I have made all the necessary

2   changes, additions or corrections, and I have signed or initialed every page.

3       I hereby declare under penalty or perjury that the foregoing statement is true, correct, and

4   complete to the best of my knowledge and belief.

5   Signature *Mary Ellen Tombs*

6   Date: *4.17.2006*

7   Subscribed and sworn to before me this *17th* day of *April* 2006

8

9   *Cynthia L. Miller*

10  ~~EEO Investigator, F & W Associates~~ *Witness*

11  Or

12  _____

13  Notary Public

14  My commission expires: _____

15

16

17

Initials *MET*    Page 5 of 5

Exhibit 3

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4
Case 1:07-cv-01607-RMU    Document 13-4    Filed 03/13/2008    Page 2 of 5
NOTIFICATION OF PERSONNEL ACTION
Exception to SF 50-B
approved by GSA/IRMS 2-87

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| CHRISTIAN, GARY E | | | | 02/17/04 |

**FIRST ACTION** / **SECOND ACTION**

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 171 | EXC APPT NTE 10/01/05 | | |

| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
|---|---|---|---|
| W9R | SCH A 213.3102 (I)(3) | | |

| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
|---|---|---|---|
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | PROGRAM ANALYST |

| 8. Pay Plan | 9. Occ Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GS | 0301 | 12 | 01 | 59,302.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | 52,281.00 | 7,021.00 | 59,302.00 | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | HOUSING AND URBAN DEVELOPMENT ICH HW  471100000000000000 |

**EMPLOYEE DATA**

| 23. Veterans Preference | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 | 1–None  2–5 Point.  3–10 Point/Disability  4–10 Point/Compensable  5–10 Point/Other  6–10 Point/Compensable/30% | 3 | 0–None  1–Permanent  2–Conditional  3–Indefinite | | YES  ☒ NO |

| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
|---|---|---|---|---|
| B0 | WAIVER | 9 | NOT APPLICABLE | |

| 30. Retirement Plan | | 31 Service Comp Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|---|
| K | FERS | 02/17/04 | | |

**POSITION DATA**

| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|
| 2 | 1–Competitive Service  2–Excepted Service  3–SES General  4–SES Career Reserved | E  E–Exempt  N–Nonexempt | | 8888 |

| 38. Duty Station Code | 39. Duty Station (City-County-State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON  DIST  OF  COLUMBIA  DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

**45. Remarks**

APPOINTMENT AFFIDAVIT EXECUTED 02/17/04.
EMPLOYEE IS AUTOMATICALLY COVERED UNDER FERS.
REASON FOR TEMPORARY APPOINTMENT: THE INTERAGENCY COUNCIL ON THE HOMELESS NTE 10/01/05.

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| HOUSING AND URBAN DEVELOPMENT | EARNESTINE PRUITT  HUMAN RESOURCES OFFICER |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|
| HW 47 | 4454 | 02/17/04 | |

5-Part   50-316

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

Printed on recycled paper

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|---|
| CHRISTIAN, GARY E. | | | | | 10-01-2005 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code 760 | 5-B. Nature of Action Ext of Appointment NTE 18-NOV-2005 | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code ZLM | 5-D. Legal Authority P.L. 100-77 DTD 07/22/87 | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| Program Analyst 3LHW013 - 1 | Program Analyst 3LHW013 - 1 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AD | 0301 | 00 | 00 | $62,886.00 | PA | AD | 0301 | 00 | 00 | $62,886.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $62,886.00 | $0 | $62,886.00 | $0 | $62,886.00 | $0 | $62,886.00 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| United States Interagency Council on Homelessness | United States Interagency Council on Homelessness |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 — 1-None, 3-10-Point/Disability, 5-10-Point/Other, 2-5-Point, 4-10-Point/Compensable, 6-10-Point/Compensable/30% | 3 — 0-None, 1-Permanent, 2-Conditional, 3-Indefinite | | YES / X NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| B0 Waived | 9 Not Applicable | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K — K - FERS and FICA | 02-17-2004 | F Full-Time | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2 — 1-Competitive Service, 3-SES General, 2-Excepted Service, 4-SES Career Reserved | E — E-Exempt, N-Nonexempt | 910.T1191100.00.11.000.001 | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 110010001 | WASHINGTON / DISTRICT OF COLUMBIA / DISTRICT OF COLUMBIA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| HW | HW100 | AD00 | | Nonsensitive (NS) National Security Risk |

45. Remarks

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| Interagency Council on the Homeless | Electronically Signed by: E. Thomas Hodnett |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | Director, Agency Liaison Division |
|---|---|---|---|
| HW00 | 4008 | 10-04-2005 | |

5-Part 50-316

Editions Prior to 7/91 Are Not Usable After 6/30/93

| 1. Name (Last, First, Middle) CHRISTIAN, GARY E. | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date 11–19–2005 |
|---|---|---|---|---|

**FIRST ACTION** | **SECOND ACTION**

| 5-A. Code 760 | 5-B. Nature of Action Ext of Appointment NTE 17–DEC–2005 | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 5-C. Code ZLM | 5-D. Legal Authority PL 100–77–dtd 07–22–87 | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number Program Analyst 3LHW013 – 1 | 15. TO: Position Title and Number Program Analyst 3LHW013 – 1 |
|---|---|

| 8. Pay Plan AD | 9. Occ. Code 0301 | 10. Grade/Level 00 | 11. Step/Rate 00 | 12. Total Salary $62,886.00 | 13. Pay Basis PA | 16. Pay Plan AD | 17. Occ. Code 0301 | 18. Grade/Level 00 | 19. Step/Rate 00 | 20. Total Salary/Award $62,886.00 | 21. Pay Basis PA |
|---|---|---|---|---|---|---|---|---|---|---|---|

| 12A. Basic Pay $62,886.00 | 12B. Locality Adj. $0 | 12C. Adj. Basic Pay $62,886.00 | 12D. Other Pay $0 | 20A. Basic Pay $62,886.00 | 20B. Locality Adj. $0 | 20C. Adj. Basic Pay $62,886.00 | 20D. Other Pay $0 |
|---|---|---|---|---|---|---|---|

| 14. Name and Location of Position's Organization United States Interagency Council on Homelessness | 22. Name and Location of Position's Organization United States Interagency Council on Homelessness |
|---|---|

**EMPLOYEE DATA**

| 23. Veterans Preference 1 | 1 – None  3 – 10-Point/Disability  5 – 10-Point/Other 2 – 5-Point  4 – 10-Point/Compensable  6 – 10-Point/Compensable/30% | 24. Tenure 3 | 0 – None  2 – Conditional 1 – Permanent  3 – Indefinite | 25. Agency Use | 26. Veterans Preference for RIF YES | X | NO |
|---|---|---|---|---|---|---|---|

| 27. FEGLI B0 | Waived | 28. Annuitant Indicator 9 | Not Applicable | 29. Pay Rate Determinant 0 |
|---|---|---|---|---|

| 30. Retirement Plan K | K – FERS and FICA | 31. Service Comp. Date (Leave) 02–17–2004 | 32. Work Schedule F | Full-Time | 33. Part–Time Hours Per Biweekly Pay Period |
|---|---|---|---|---|---|

**POSITION DATA**

| 34. Position Occupied 2 | 1 – Competitive Service  3 – SES General 2 – Excepted Service  4 – SES Career Reserved | 35. FLSA Category E | E – Exempt N – Nonexempt | 36. Appropriation Code 910.T1191100.00.11.000.001 | 37. Bargaining Unit Status 8888 |
|---|---|---|---|---|---|

| 38. Duty Station Code 110010001 | 39. Duty Station (City – County – State or Overseas Location) WASHINGTON / DISTRICT OF COLUMBIA / DISTRICT OF COLUMBIA |
|---|---|

| 40. Agency Data HW | 41. HW100 | 42. AD00 | 43. | 44. Nonsensitive (NS) National Security Risk |
|---|---|---|---|---|

45. Remarks

---

| 46. Employing Department or Agency Interagency Council on the Homeless | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| 47. Agency Code HW00 | 48. Personnel Office ID 4008 | 49. Approval Date 11–25–2005 | Electronically Signed by: E. Thomas Hodnett Director, Agency Liaison Division  3 |

5–Part 50–316

Editions Prior to 7/91 Are Not Usable After 6/30/9
NSN 7540-01-333-601

U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| CHRISTIAN, GARY E. | ▮▮▮▮▮ | ▮▮▮▮▮ | 12–18–2005 |

**FIRST ACTION**

| 5–A. Code | 5–B. Nature of Action |
|---|---|
| 760 | Ext of Appointment NTE 01–OCT–2006 |

| 5–C. Code | 5–D. Legal Authority |
|---|---|
| ZLM | P.L. 100–77 DTD 07/22/87 |

| 5–E. Code | 5–F. Legal Authority |
|---|---|
| | |

**SECOND ACTION**

| 6–A. Code | 6–B. Nature of Action |
|---|---|
| | |

| 6–C. Code | 6–D. Legal Authority |
|---|---|
| | |

| 6–E. Code | 6–F. Legal Authority |
|---|---|
| | |

**7. FROM: Position Title and Number**

Staff Assistant
3LHW018 – 1

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| AD | 0301 | 00 | 00 | $62,886.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| $62,886.00 | $0 | $62,886.00 | $0 |

**14. Name and Location of Position's Organization**

United States Interagency
Council on Homelessness

**15. TO: Position Title and Number**

Staff Assistant
3LHW018 – 1

| 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| AD | 0301 | 00 | 00 | $62,886.00 | PA |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| $62,886.00 | $0 | $62,886.00 | $0 |

**22. Name and Location of Position's Organization**

United States Interagency
Council on Homelessness

**EMPLOYEE DATA**

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 — 1 – None  3 – 10–Point/Disability  5 – 10–Point/Other  2 – 5–Point  4 – 10–Point/Compensable  6 – 10–Point/Compensable/30% | 3 — 0 – None  2 – Conditional  1 – Permanent  3 – Indefinite | | YES   X   NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| B0   Waived | 9   Not Applicable | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part–Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K   K – FERS and FICA | 02–17–2004 | F   Full–Time | |

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2 — 1 – Competitive Service  3 – SES General  2 – Excepted Service  4 – SES Career Reserved | E   E – Exempt  N – Nonexempt | 910.T1191100.00.11.000.001 | 8888 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 110010001 | WASHINGTON / DISTRICT OF COLUMBIA / DISTRICT OF COLUMBIA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| HW | HW100 | AD00 | | Nonsensitive (NS) National Security Risk |

**45. Remarks**

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| Interagency Council on the Homeless | Electronically Signed by: E. Thomas Hodnett |
| **47. Agency Code**  HW00   **48. Personnel Office ID**  4008   **49. Approval Date**  12–20–2005 | Director, Agency Liaison Division |

5–Part 50–316

Editions Prior to 7/91 Are Not Usable After 6/30/93

Exhibit 4

# In The Matter Of:

### GARY I. CHRISTIAN    v.
### U.S. INTERAGENCY COUNCIL ON HOMELESSNESS

---

### GARY I. CHRISTIAN
### October 4, 2006

---

*For The Record, Inc.*
*Court Reporting and Litigation Support*
*10760 Demarr Road*
*White Plains, MD  USA  20695*
*(301) 870-8025    FAX: (301) 870-8333*

Original File 61004CHR.ASC, 68 Pages
Min-U-Script® File ID: 2636360210

# Word Index included with this Min-U-Script®

Page 1

[1]        UNITED STATES OF AMERICA

[2]        GENERAL SERVICES ADMINISTRATION

[3]

[4]    In the Matter of:                    )

[5]    GARY I. CHRISTIAN,               ) EEOC Case No.

[6]        vs.                                ) 570-2006-00528X.

[7]    UNITED STATES INTERAGENCY    )

[8]    COUNCIL ON HOMELESSNESS.   )

[9]

[10]

[11]

[12]        The deposition of GARY I. CHRISTIAN was

[13]    taken on Wednesday, October 4, 2006, commencing

[14]    at 1:20 p.m., at the offices of the United

[15]    States General Services Administration, 1800 F

[16]    Street, N.W., Room 4140, Washington, D.C.,

[17]    before Sally Jo Bowling, Notary Public.

[18]

[19]

[20]

[21]

[22]

Page 2

[1]        APPEARANCES

[2]

[3]  ON BEHALF OF THE GSA:

[4]        CAROLINE HIGGINS, ESQ.

[5]        General Services Administration

[6]        1800 F Street, N.W.

[7]        Washington, D.C.

[8]        (202) 208-0497

[9]        caroline.higgins@gsa.gov

[10]

[11]

[12]

[13]  (Index appears following the transcript.)

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

Page 3

PROCEEDINGS

EXAMINATION
BY MS. HIGGINS:

[5]    Q: So, good afternoon, Mr. Christian, I'm

[6] Caroline Higgins and I am representing the

[7] United States Interagency Council on

[8] Homelessness in this matter, and we are here

[9] today in connection with your employment

[10] discrimination complaint and your pending

[11] hearing before the Equal Opportunity Commission

[12] with Judge Snyder, and the case in this matter

[13] is Gary Christian versus Philip Mangano, M A N G

[14] A N O, Executive Director, U.S. Interagency

[15] Council on Homelessness, that's EEOC case number

[16] 570-2006-00528X.

[17]    Okay. If at any time during this

[18] deposition you do not understand one of my

[19] questions, please just clarify and let me know.

[20] And another thing, because we're trying to

[21] create a record of this, please answer all of my

[22] questions with yes or no, and not a head shake

Page 4

[1] or an um-hmm, okay? If you need to take a break

[2] at any time, also just let us know and we'll

[3] have to do that.

[4]    A: Yes.

Whereupon—
GARY I. CHRISTIAN

[7] a witness, called for examination, having been

[8] first duly sworn, was examined and testified as

[9] follows:

BY MS. HIGGINS:

[11]    Q: I'm going to start off by asking you a

[12] series of generic questions that I ask every

[13] deponent. First, are you on any medication as

[14] you sit here today that would affect your

[15] ability to remember and relate events?

[16]    A: No.

[17]    Q: Have you ever been convicted of a

[18] felony?

[19]    A: No.

[20]    Q: Have you ever been convicted of any

[21] misdemeanors?

[22]    A: No.

Page 5

[1] **Q:** Have you ever been arrested?

[2] **A:** No.

[3] **Q:** Have you ever been sued civilly in a

[4] court?

[5] **A:** No.

[6] **Q:** Have you ever testified in a civil or

[7] criminal proceeding?

[8] **A:** No.

[9] **Q:** Has anyone ever accused you of fraud?

[10] **A:** No.

[11] **Q:** Have you ever sued an employer?

[12] **A:** Yes.

[13] **Q:** Okay. Let's talk about that. When did

[14] the suit occur?

[15] **A:** 1994.

[16] **Q:** 1994?

[17] **A:** Um-hmm.

[18] **Q:** And who was the employer?

[19] **A:** It was a company called World Safari.

[20] **Q:** World Safari, that sounds exciting.

[21] **A:** Um-hmm.

[22] **Q:** Where were they?

Page 6

[1] **A:** Arlington, Virginia.

[2] **Q:** Arlington, Virginia?

[3] **A:** Um-hmm.

[4] **Q:** And why did you sue them?

[5] **A:** They weren't paying overtime pay, so it

[6] was a class action suit against them.

[7] **Q:** So, let me see if I understand this

[8] correctly. You were part of a class that sued

[9] on the basis of not receiving overtime pay?

[10] **A:** Correct.

[11] **Q:** How many other people were in the

[12] class?

[13] **A:** Three people. It was a very small

[14] company.

[15] **Q:** So, there were three plaintiffs?

[16] **A:** Correct. Well, four, total.

[17] **Q:** Four total, including yourself.

[18] **A:** Correct.

[19] **Q:** And what was the outcome of this suit?

[20] **A:** A settlement.

[21] **Q:** And where did you file the suit? Was

[22] it in federal court?

Page 7

[1] **A:** Yes, it was, I guess. I have the date.

[2] I assume so. We had an attorney in Falls Church

[3] somewhere.

[4] **Q:** Do you know the name of the attorney?

[5] **A:** Mils Peterson.

[6] **Q:** Mils Peterson?

[7] **A:** Mils, M I L S.

[8] **Q:** M I L S, Peterson. And you said that

[9] the case was settled?

[10] **A:** Yes.

[11] **Q:** And did you, after the settlement,

[12] remain employed with this company?

[13] **A:** No, this was after I had left the

[14] company.

[15] **Q:** So, the settlement occurred after you

[16] left the company?

[17] **A:** Um-hmm. Yes.

[18] **Q:** So, you did not stay with the —

[19] **A:** No, I had already left the company

[20] before we even filed the suit.

[21] **Q:** Now I'm confused. You left the company

[22] before the suit was filed, so how are you saying

Page 8

[1] that you previously sued an employer?

[2] **A:** Well, they were my employer at one

[3] time, so then if they —

[4] **Q:** Let me ask you this, were you a named

[5] party to this proceeding?

[6] **A:** Yes. But I wasn't an employee, I was a

[7] former employee.

[8] **Q:** So, you filed suit as a former employee

[9] based on not receiving overtime?

[10] **A:** When I was there, correct.

[11] **Q:** What was the time frame?

[12] **A:** That I worked there?

[13] **Q:** Um-hmm.

[14] **A:** Must have been from '92 to '9 — mid

[15] '92 to mid-'94, I think. I don't remember the

[16] dates.

[17] **Q:** So, did you ever see any money or

[18] anything as a result of this?

[19] **A:** Yes.

[20] **Q:** You received some money?

[21] **A:** Yes.

[22] **Q:** Compensation for the overtime?

GARY I. CHRISTIAN
Case 1:07-cv-01607-RMU    Document 13-5    Filed 03/13/2008    Page 5 of 10
U.S. INTERAGENCY COUNCIL ON HOMELESSNESS

GARY I. CHRISTIAN
October 4, 2006

Page 9

[1]  **A:** Yes.

[2]  **Q:** As a result of the settlement?

[3]  **A:** That's correct.

[4]  **Q:** The next question I'm going to ask you

[5]  is, have you ever filed an EEO complaint in the

[6]  past?

[7]  **A:** No.

[8]  **Q:** Is this the first EEO complaint, I'm

[9]  talking about the case that we have pending

[10]  right now, the case EEO number 570-2006-00528X,

[11]  is this the first EEO complaint that you've ever

[12]  filed?

[13]  **A:** Ever, yes.

[14]  **Q:** Okay. So, you're alleging in your

[15]  claim or your complaint that you were

[16]  discriminated against on the basis of your

[17]  religion, as well as your race, so let me see,

[18]  your religion is Catholic, correct?

[19]  **A:** Yes.

[20]  **Q:** Okay. Are you christian?

[21]  **A:** Christian Catholic? Yes.

[22]  **Q:** Okay.

Page 10

[1]  **A:** I don't think there's another kind.

[2]  **Q:** So, that means you accept Jesus Christ,

[3]  right?

[4]  **A:** Correct.

[5]  **Q:** Okay. Now, I just wanted to get that

[6]  on the record. Now we are going to move to the

[7]  report of investigation. So, I had a copy made

[8]  for you. I know that you probably have one at

[9]  home, but this was just as a safety in case you

[10]  didn't bring it with you.

[11]  **A:** Great, thank you.

[12]  **Q:** So, I want to call your attention to

[13]  your affidavit.

[14]  **A:** Okay.

[15]  **Q:** Which would be tab F, I believe.

[16]  **A:** So, we're finished with the —

[17]  **Q:** The generic questions.

[18]  **A:** Okay.

[19]  **Q:** Oh, wait, I gave you mine. I have

[20]  those tabs in there, sorry.

[21]  **A:** That's all right. Okay.

[22]  **Q:** So, can you just take a second, scan

Page 11

[1]  through this and identify for the record that it

[2]  is, in fact, your affidavit.

[3]  **A:** It is.

[4]  **Q:** And can you verify that you executed

[5]  this affidavit on April 6th, 2006, by looking at

[6]  the signature page.

[7]  **A:** When you say executed, what do you

[8]  mean?

[9]  **Q:** That you signed this and claimed it as

[10]  your affidavit?

[11]  **A:** Yes. It was not — I didn't offer my

[12]  affidavit, this is when I signed it after I

[13]  received the written copy.

[14]  **Q:** Okay.

[15]  **A:** Right.

[16]  **Q:** Now, I would like to call your

[17]  attention to paragraph 4 of the affidavit, it

[18]  starts on the second page, it states, "The

[19]  management official responsible for the decision

[20]  about which I complained is Darren Franklin,

[21]  office administrator." Do you see that?

[22]  **A:** Yes.

Page 12

[1]  **Q:** First, let's discuss the decision about

[2]  which you complain. Can you explain exactly

[3]  what you mean by that. What is the decision?

[4]  **A:** The decision to remove me from my job

[5]  and replace me with someone else.

[6]  **Q:** When you say remove, how were you

[7]  removed?

[8]  **A:** I was brought into his office, he was

[9]  the office administrator, my direct — my first

[10]  level supervisor director was the executive

[11]  director up until October or November 23rd,

[12]  2005, when Darren Franklin, the office

[13]  administrator, the person mentioned here,

[14]  brought me into his office and said that he

[15]  would be my supervisor and that I would no

[16]  longer be doing, performing the duties that I

[17]  had been doing since I started there, which was

[18]  back January of 2004.

[19]  **Q:** When did he tell you this?

[20]  **A:** November 23rd, 2005.

[21]  **Q:** Who else was in this meeting?

[22]  **A:** No one but Stacy Pickstock was one of

Page 13

[1] the — we were the only two people left there,
[2] because it was early Thanksgiving break, it must
[3] have been 2:00 in the afternoon, but she was
[4] there when he came and summoned me to his
[5] office, and she was there when I left there and
[6] we still had work to do, but due to the shock, I
[7] was pretty upset, and had to leave, so she
[8] witnessed that whole thing. I told her, you
[9] know, I said I can't stay here right now, I have
[10] to leave. So, she saw everything that happened.
[11] She wasn't in the meeting.
[12]     Q: So, let me make sure I have this
[13] correct. Only you and Mr. Franklin were the two
[14] people in the meeting?
[15]     A: That is correct, yes.
[16]     Q: And what exactly did he tell you in
[17] that meeting?
[18]     A: He said I've decided to make some
[19] changes in what you're doing here, and I said,
[20] okay. And he said, this is your new job
[21] description, and he handed me a new job
[22] description, which was staff assistant. When I

Page 14

[1] read through the responsibilities, I said, okay,
[2] then basically I'm doing nothing? And he looked
[3] at me and he said, nothing? And I said, yeah,
[4] there's really nothing here listed for me to do,
[5] other than help people when needed. And he
[6] said, oh, no, no, no, no, no, you'll be doing
[7] filing and stuff like that. And I said, okay,
[8] whatever. And I said, so who's going to be
[9] doing my job? And he said, Cynthia Miller.
[10]     And, so, I stood up, and he said, oh,
[11] here's your copy. And I gave him his copy of
[12] his job description back and I left.
[13]     I went to see Stacy Pickstock, who was
[14] at my desk at the time, because we were working
[15] on a project, and left.
[16]     Q: So, he basically told you you were
[17] going to be a staff assistant and handed you
[18] with what I would describe as a description of
[19] the duties that were involved?
[20]     A: Well, it was a new job description.
[21]     Q: Which, yes, I believe is —
[22]     A: Tab G3.

Page 15

[1]     Q: G3, that's what he handed you?
[2]     A: Yes.
[3]     Q: Okay. Now, when he said Cynthia Miller
[4] will do your job, what exactly was Cynthia
[5] Miller doing before?
[6]     A: She was answering the phones and doing
[7] special projects, whatever they asked her to do,
[8] that kind of thing.
[9]     Q: And what did she do after you became
[10] staff assistant?
[11]     A: My job.
[12]     Q: Which is?
[13]     A: Scheduling of executive director's
[14] travel, managing his calendar, preparing
[15] speeches, doing research, whatever the executive
[16] director needed, I was basically his assistant.
[17]     Q: We'll come back to that. Let's go on
[18] in that paragraph 4 of your affidavit, you
[19] state, "Mr. Darren Franklin is black and his
[20] religion is other than Catholic. He states that
[21] his religion is saved."
[22]     A: Yes.

Page 16

[1]     Q: To whom did he make that statement?
[2]     A: He made that statement to Stacy
[3] Pickstock.
[4]     Q: So, did he ever directly tell you that
[5] he was saved?
[6]     A: No, not directly.
[7]     Q: So, the only way that you know that he
[8] stated his religion as saved is because Stacy
[9] Pickstock told you?
[10]     A: Yes.
[11]     Q: So, she could be making that up, as far
[12] as you know?
[13]     A: No.
[14]     Q: Okay, so how do you know she's not
[15] making that up?
[16]     A: Because she had been told before any of
[17] this happened, she told me —
[18]     Q: What had been told?
[19]     A: She told me this story.
[20]     Q: What story?
[21]     A: About — that Darren told her — I
[22] said — I had told her one time I went into his

Page 17

[1] office and I heard this like African-American
[2] religious holy-roller music, I don't know how —
[3] I don't know what it is, but I think you know
[4] what I'm trying to get across. He was playing
[5] that quite loudly and I told her that, and she
[6] in turn told me, well, yeah, he told me that he
[7] and Cynthia are saved, and that he used to smoke
[8] and he used to drink, but he doesn't do that any
[9] longer.
[10]    Q: Okay. So, doesn't being saved mean
[11] that you accept Jesus Christ?
[12]    A: I don't know what being saved means,
[13] but they put it in a way that's different
[14] from — I don't call myself saved, no.
[15]    Q: So, how do you define being saved? Do
[16] you define being saved? What's your definition
[17] of that?
[18]    A: I don't know what it is, but it's
[19] something other than us, anyone else. I mean,
[20] it is perfectly clear that they were different
[21] than us.
[22]    Q: And who is the us?

Page 18

[1]    A: Anyone else that's not saved.
[2]    Q: Okay. And how did they make this
[3] perfectly clear?
[4]    A: By using the word saved.
[5]    Q: Okay, who exactly used the word saved?
[6]    A: Darren Franklin.
[7]    Q: Okay, and you know that he used the
[8] word saved because he told Stacy that he and
[9] Ms. Miller were saved?
[10]    A: Yes, that's correct.
[11]    Q: Did he say anything else?
[12]    A: Yeah, I told you that he said that he
[13] used to be — used to smoke and used to drink,
[14] but doesn't do that stuff anymore since he was
[15] saved, like Cynthia.
[16]    Q: Like Cynthia?
[17]    A: Correct.
[18]    Q: And that's all he said?
[19]    A: I suppose. I mean, we didn't go into
[20] great detail about it. Later, after this
[21] incident happened, Stacy and I had had some
[22] conversations, and she said, yeah, they think

Page 19

[1] that they can do evil things, like take your job
[2] away, and make such plots to get her job, and
[3] then go home and pray about it, because they're
[4] saved. Now, you know what — you know what
[5] saved is. I mean, it's some sort of — what's
[6] the word — better than thou christian rite or
[7] something. You know, all others are sinners,
[8] even though they profess Christianity. That's
[9] my understanding of what saved means, and I
[10] mean, I don't — I mean, I'm a christian, I'm a
[11] Catholic, but I don't go around saying I'm
[12] saved, like I've got some sort of, you know,
[13] direct report to heaven or God or anything like
[14] that.
[15]    Q: Okay.
[16]    A: Or that I have any kind of special
[17] right to do anything just because I'm, quote
[18] unquote, saved. That's my understanding, and I
[19] think that's everyone's understanding. So —
[20]    Q: Okay. Did Mr. Franklin ever tell you
[21] directly that he was saved?
[22]    A: I already answered that question.

Page 20

[1]    Q: I'm sorry?
[2]    A: I already answered that question, and
[3] it was no.
[4]    Q: Okay. Did Ms. Miller ever tell you
[5] directly that she was saved?
[6]    A: Ms. Miller and I never had any
[7] conversations.
[8]    Q: Okay. So, Stacy Pickstock, am I saying
[9] her last name correctly?
[10]    A: Yes.
[11]    Q: She's the one who informed you of this?
[12]    A: That's — yes, that's correct.
[13]    Q: And that's what you're basing the
[14] discrimination based on — or that's how you're
[15] alleging discrimination based on religion,
[16] correct?
[17]    A: Yes.
[18]    Q: Okay. Let's look at paragraph 5 of
[19] your affidavit.
[20]    A: Yes.
[21]    Q: It starts with, "The duties that I
[22] performed."

Page 21

[1] **A:** Yes.

[2] **Q:** "As a program analyst were taken from
[3] me as of November 23rd, 2005." Then you go on
[4] and list the duties that you had as a program
[5] analyst, correct?

[6] **A:** Yes.

[7] **Q:** You say, "I managed the executive
[8] director's travel and hotel arrangements,
[9] prepared his speeches, kept his calendar, and
[10] did research as he needed it done."

[11] Who performed these duties after you
[12] became a staff assistant? I want you to go
[13] through each one, each duty that you have listed
[14] there, and tell me who currently or as of
[15] November 23rd, 2005, started performing those
[16] duties. Okay?

[17] **A:** Okay. For hotel arrangements, it was
[18] Cynthia Miller. For preparing his speeches, it
[19] was whoever was available, because Cynthia
[20] Miller couldn't handle the job. For keeping his
[21] calendar, it was Cynthia Miller. For doing
[22] research, it was Cynthia Miller and whoever else

Page 22

[1] was available, they spread it out amongst other
[2] people.

[3] **Q:** So, for preparing his speeches, it was
[4] whoever else was available. By whoever else, do
[5] you mean your other coworkers?

[6] **A:** Yes. Other coworkers, including
[7] myself.

[8] **Q:** So, you did, in fact, sometimes prepare
[9] his speeches after November 23rd, 2005?

[10] **A:** Yes. That's because I was a good
[11] typist.

[12] **Q:** Okay. So, for research, you say
[13] whoever else did the research, by whoever else,
[14] do you mean coworkers?

[15] **A:** Yes.

[16] **Q:** Including yourself?

[17] **A:** No.

[18] **Q:** So, you no longer performed the
[19] research?

[20] **A:** Correct.

[21] **Q:** So, who would be the other people that
[22] performed the research?

Page 23

[1] **A:** I have no idea. I just know from what
[2] Stacy told me. You have to remember that after
[3] November 23rd, 2005, I wasn't spoken to. Other
[4] than Stacy, I was placed in an office, and no
[5] one spoke to me. I was given nothing to do,
[6] other than a few little projects like changing
[7] filing cabinet folders and rearranging some
[8] electronic files. All of this is in my
[9] statement of interrogatories.

[10] So, I don't know the answer to a lot of
[11] these questions, because I was basically locked
[12] in an office, far from everybody else, and no
[13] one spoke to me. So, the only person that was
[14] really supportive of me was Stacy Pickstock and
[15] William Thomas, but then there became a point
[16] where Darren Franklin wasn't speaking to William
[17] Thomas, because of whatever reason, and then
[18] William Thomas stopped speaking with me. And
[19] then Stacy got upset during the proceedings of
[20] the EEOC, because I was using information that
[21] she had given me as evidence, and she stopped
[22] speaking to me.



*mom't treated everyone the same*

Page 24

[1] So, the last four months that I was
[2] there, I wasn't spoken to at all. But in
[3] general, I was completely alienated, so I can't
[4] answer questions about who was doing what,
[5] because I don't know, other than what Stacy was
[6] telling me.

[7] **Q:** Okay.

[8] **A:** And there were certain things that
[9] Stacy would send to me via email, showing where
[10] Cynthia was lax in her job, and that kind of
[11] stuff. That's all the information I was
[12] getting. So I can't answer questions like that.
[13] I don't know for sure who was doing what.

[14] **Q:** So, let's revisit this, I know you just
[15] mentioned it briefly, but I want you to be as
[16] specific as possible. The last statement in
[17] paragraph 5 says, "I do whatever Darren tells me
[18] to do, e.g. filing."

[19] **A:** Yes.

[20] **Q:** So, what exactly were you doing?

[21] **A:** Well, we had moved to new servers when
[22] we moved from the HUD Building in September of

Page 25

[1] 2005. So, we had new servers, so we had the
[2] opportunity to clean up the general drive, which
[3] was everyone's files, and that took me a couple
[4] of days. Darren and I met with Mary Ellen
[5] Holmes, the deputy director, after I completed
[6] my roadmap for reorganizing the files. And it
[7] was done in matter of a week or two, at most.
[8] And that didn't start until probably December
[9] 1st. The first week that I was there, I didn't
[10] hear from anyone, when I went back, after I was
[11] moved from my job.
[12]    Q: December 1st, 2000?
[13]    A: 2005, right.
[14]    Q: 2005.
[15]    A: And then later on there was back and
[16] forth email with me and Darren, and he wanted me
[17] to, quote unquote, reorganize the files in the
[18] filing room, and I kept explaining to him that I
[19] had no idea what the files are. They were files
[20] that were there long before I was there. I
[21] don't know how he wants them organized. I said
[22] in one email that I didn't, you know, take

Page 26

[1] filing in college, it was just not something
[2] that I knew how to do.
[3]    So, it came down to the point where he
[4] had a meeting with me in the file room, and it
[5] came to the point of just basically changing all
[6] the folders to the same color, and putting new
[7] tabs on it. Which took me a couple of weeks,
[8] three or four weeks.
[9]    Q: Three or four weeks, and that's all you
[10] were doing for that time?
[11]    A: That's correct.
[12]    Q: So, what did you do after — three or
[13] four weeks, so we're in January at this point,
[14] January 2006?
[15]    A: Well, no, I mean, it took — no,
[16] because I — there were back and forth emails.
[17] No, there was a period there where there was a
[18] lull, where I really wasn't doing anything, and
[19] then probably the first week of March or last
[20] week of February is when he sent me a nasty
[21] saying that I hadn't done my job, and all this
[22] kind of stuff. And I explained to him, I don't

Page 27

[1] know what to do. And that's where it came to
[2] the point where he just said, I need you to do
[3] this. So, it came, like I said, to the point of
[4] just putting all the folders in the same color.
[5]    Q: So, when did you complete that task?
[6]    A: Well, the last — the last status
[7] report that I sent to him on that was March
[8] 31st. It's in here somewhere. I referenced it
[9] in my answer to the interrogatories. Oh, here
[10] it is. It's in tab F2.c.
[11]    Q: Okay.
[12]    A: The seventh page, where I said what I
[13] did for the week ending March 31st, 2006, and
[14] for next week, I'm not sure.
[15]    Q: Okay. So, what did you do after March
[16] 31st, 2006?
[17]    A: Nothing.
[18]    Q: And when you say nothing, can you
[19] describe that for me? Give me a day to day,
[20] what were your — what were your duties?
[21]    A: I had none.
[22]    Q: So, what did you — you went to work,

Page 28

[1] and did you alert anyone that you didn't have
[2] anything to do?
[3]    A: Yes.
[4]    Q: Who did you tell?
[5]    A: Mary Ellen Holmes.
[6]    Q: And what did she do?
[7]    A: Nothing.
[8]    Q: So, tell me what you did all day.
[9]    A: Just sat and read the news on the web,
[10] looked out the window. You have to remember, no
[11] one was speaking to me, either.
[12]    Q: Did you —
[13]    A: Including Mr. Franklin.
[14]    Q: So, did you email Mr. Franklin and tell
[15] him that you had nothing more to do?
[16]    A: He had my status report. And I sent
[17] him an email stating what follow-up I wanted,
[18] because he wanted me to look for some sort of
[19] tracking system or something like that. That's
[20] in here as well. Some — I don't remember the
[21] tab. I don't remember where it is in here. But
[22] I sent him an email on the correspondence

Page 29

[1] tracking system, asking him for feedback. He
[2] said great work, I'll get back with you on this,
[3] and I never heard from him. That's also in the
[4] same tab. All that correspondence is in the
[5] same tab.
[6] **Q:** Well, let's look at paragraph 6.
[7] **A:** Okay.
[8] **Q:** In paragraph 6, you state that you were
[9] the only program analyst in your unit, that you
[10] had never asked that your duties be taken away
[11] from you, you were removed from your job duties
[12] entirely without explanation as to why Cynthia
[13] Miller would be in that role in place of you.
[14] Did Cynthia Miller become a program analyst?
[15] **A:** I don't know what she became.
[16] **Q:** Do you know her role?
[17] **A:** To perform my job.
[18] **Q:** When you say perform your job, what do
[19] you mean? All of the duties that you were
[20] previously doing?
[21] **A:** Well, the way that it was put to me,
[22] yes. After that, I am not so sure. So, the way

Page 30

[1] that it was explained to me, when I asked who's
[2] going to be doing my job, on November 23rd,
[3] 2005, when I met with Mr. Franklin, he said
[4] Cynthia Miller, okay? How they distributed it
[5] is of their choice. But what I was told was
[6] that I was to remove my things from my desk and
[7] to move into the small office next to the filing
[8] room and that Cynthia Miller would be doing my
[9] job. That's all that I know.
[10]    If you get into, well, they distributed
[11] it amongst several different people, that was
[12] their business. But the way that it was put to
[13] me was that I no longer would be performing my
[14] duties. Period.
[15] **Q:** Then later in that paragraph, you say,
[16] we're talking about paragraph 6, "I believe
[17] Ms. Miller was put in the position because of
[18] her being the same race, black, and faith as
[19] Mr. Franklin." Why exactly do you believe this?
[20] **A:** Because it was very clear when he
[21] brought her in as a temporary or contract
[22] employee that they were more than just, you

Page 31

[1] know, chance acquaintances, because of
[2] one-on-one conversations in his office. They
[3] would have lunch together, pow-wow together,
[4] it's a very, very small office, so you see what
[5] most people are — what everyone's doing, and it
[6] was obvious, at least to me, that they were
[7] friends prior to. I cannot confirm that, okay?
[8] But it was pretty obvious that they knew each
[9] other. Not unless they just became instant
[10] friends when she was brought on board.
[11] **Q:** So, this is based on your observation?
[12] **A:** Yes.
[13] **Q:** Did you overhear any specific
[14] conversations, or did you just see them going to
[15] lunch together every now and then?
[16] **A:** Every day.
[17] **Q:** Okay, so they went to lunch together
[18] every day?
[19] **A:** Mostly, when he was there, and when she
[20] was there, yes.
[21] **Q:** So, how do you know that they were
[22] going to lunch?

Page 32

[1] **A:** Because they sat in the lunch room
[2] together.
[3] **Q:** So, everyone eats in the lunch room?
[4] **A:** No.
[5] **Q:** No. Okay, so they sat in the lunch
[6] room together. If other employees wanted, could
[7] they also go to the lunch room?
[8] **A:** Yes.
[9] **Q:** So, they could have also been in the
[10] room at the same time as Mr. Franklin and
[11] Ms. Miller?
[12] **A:** Yes.
[13] **Q:** Okay. And you also said that they had
[14] pow-wows. What exactly do you mean by that?
[15] **A:** The office that we're talking about
[16] here is not a normal atmosphere. The executive
[17] director is extremely abusive, okay? He will
[18] yell at people, use foul language, now the
[19] deputy director will do the same. The deputy
[20] director is the devil's advocate. So, no one
[21] speaks hardly at all in the office, unless
[22] they're like, you know, doing it very quietly.

Page 33

[1] If you go into the office, it's more like going
[2] into a morgue, as opposed to going into like a
[3] regular atmosphere. And I have spoken to, you
[4] know, friends and family about the situation,
[5] and no one can believe that I stood there as
[6] long as — or stayed there as long as I did,
[7] given the atmosphere.
[8]     Now, when two people, okay, who —
[9] there was just a temporary employee, when two
[10] people come in contact, and they suddenly become
[11] like a bond, where they're like husband and
[12] wife, like where one goes, the other one goes,
[13] it's kind of obvious. It's very obvious. So,
[14] if you asked anybody else, I would believe they
[15] would say the same thing.
[16]     So, that's the reason it's — it was
[17] like, what's going on here? You know, and then
[18] he kept having her involved in meetings, as a
[19] temporary employee, like scheduling meetings and
[20] things like that, which no one else —
[21]     Q: What do you mean she was involved in
[22] meetings?

Page 34

[1]     A: Well, she would just be invited to come
[2] and sit and listen.
[3]     Q: Okay, and so you really don't know why
[4] she was invited?
[5]     A: No.
[6]     Q: It could have been because she was new
[7] and she needed to get up to speed on something?
[8]     A: That's speculation. I don't know.
[9]     Q: Let's go to paragraph 7 on the next
[10] page.
[11]     A: Okay.
[12]     Q: You state, "On or about October of
[13] 2005, Mr. Franklin and deputy director Mary
[14] Ellen Holmes met with Cynthia Miller and me, and
[15] informed me that due to the added burden put on
[16] me to prepare travel authorizations, Mr. William
[17] Thomas, Caucasian, religion unknown, would begin
[18] preparing briefing materials for the executive
[19] director, and that Cynthia would be managing the
[20] public calendar, that is accessible by everyone
[21] in the office."
[22]     A: Yes.

Page 35

[1]     Q: Did you tell Mr. Franklin that you
[2] needed help with the travel authorizations?
[3]     A: No.
[4]     Q: So, you never told him —
[5]     A: No.
[6]     Q: That your workload was —
[7]     A: No. What I explained to Mr. Franklin,
[8] there was — since the beginning when we had
[9] another office administrator, her name was
[10] Margaretta Kennedy, she prepared the travel
[11] authorization forms after she received
[12] confirmation of the executive director's travel,
[13] and his hotel accommodations, because he can be
[14] in two hotels in one day, and he can be on three
[15] or four flights in one day. And those flights
[16] can change. So, it was like a continually,
[17] continually changing process.
[18]     So, what I explained to him, which we
[19] went back and forth and back and forth on, and
[20] there's emails included in here on that very
[21] subject, in the report of investigation,
[22] regarding the fact that due to the constant

Page 36

[1] changes, I could not always have a travel
[2] authorization form prepared before a travel was
[3] done. So, that's where he was bullying me and
[4] saying, yes, it has to be done that way. You
[5] cannot — and, you know, this was just out of
[6] the blue. You know, he had been there since
[7] April, all of the sudden in October, he wants
[8] travel authorization forms done for travel he
[9] has performed.
[10]     Yes, my understanding, as I explained
[11] to him, is that's the way it's supposed to be.
[12] Any place that I've worked at that is the way
[13] it's supposed to be. But I explained to him
[14] that it couldn't always be done just before each
[15] and every change in travel, because of the —
[16] because of the amount of changes.
[17]     I never said that it was added burden.
[18] I never said that. I've never used that.
[19]     Q: So, you said that it would be hard or
[20] next to impossible for you to always have the
[21] travel authorizations prepared in a timely
[22] manner?

Page 37

[1] **A:** That's correct.

[2] **Q:** Okay. Now, preparing briefing

[3] materials and managing the public calendar, were

[4] these duties that you performed prior to

[5] November 23rd, 2005?

[6] **A:** Briefing materials, yes. Public

[7] calendar was never kept.

[8] **Q:** Okay. So, the duty of preparing the

[9] briefing materials was after November 23rd, 2005

[10] performed by Mr. Thomas, correct?

[11] **A:** Yes, that's correct.

[12] **Q:** Who is Caucasian, correct?

[13] **A:** Yes, that's correct.

[14] **Q:** Okay. And that was a duty that you

[15] used to perform?

[16] **A:** Yes.

[17] **Q:** When you were a program analyst,

[18] correct?

[19] **A:** Yes, that's correct.

[20] **Q:** Okay. Let's go to paragraph 8. You

[21] state, "On November 23rd, 2005, Mr. Franklin

[22] called me into his office just prior to the

Page 38

[1] staff being released early for Thanksgiving

[2] holiday and informed me that I would no longer

[3] be working in my current position, and he handed

[4] me a new job description for staff assistant."

[5] Again, I just want to make sure the

[6] record is clear. Only you and Mr. Franklin were

[7] present in that meeting, correct?

[8] **A:** Yes.

[9] **Q:** Did Mr. Franklin meet with other

[10] coworkers that day?

[11] **A:** I don't know.

[12] **Q:** You don't know? Okay. And when you

[13] say "your current position," you mean your

[14] current position as a program analyst?

[15] **A:** Yes. Well, the job duties that I

[16] performed under the title of program analyst.

[17] **Q:** Okay. So, how did you respond?

[18] **A:** I answered that question already. Do

[19] you want me to?

[20] **Q:** I want you to just go over it again.

[21] **A:** I was — I said, so, who — well, he

[22] handed me a new job description. And I said,

Page 39

[1] so, I went through it and I said, well, then I'm

[2] basically doing nothing, and I sort of took the

[3] job description and laid it heavily on his desk,

[4] and he said, I want you to move all your things

[5] from your desk and move them to the small office

[6] next to the filing room.

[7] **Q:** Did he tell you why you were moving to

[8] the small office?

[9] **A:** No.

[10] **Q:** Did you ask him?

[11] **A:** No, I was in shock. So, I didn't ask.

[12] I didn't ask any questions. It was — it was

[13] basically one of those, you're fired, but you're

[14] still going to be here kind of conversations.

[15] So, I — when I asked him who was going to be

[16] performing my duties, he said Cynthia Miller. I

[17] said, okay, and I got up, and he took the job

[18] description that I had already laid back on his

[19] desk, and I said, no, thank you, I don't need a

[20] copy. And I went back to my desk, where I was

[21] working on a project with Stacy Pickstock, and I

[22] said they took my job away from me, and I can't

Page 40

[1] stay here. And so I left. And I came back the

[2] Tuesday after the Thanksgiving holiday.

[3] **Q:** Okay.

[4] **A:** And moved my stuff.

[5] **Q:** Can you tell me again which specific

[6] duties were taken away?

[7] **A:** My job. I specifically asked Darren

[8] Franklin who is going to be doing what I'm

[9] doing? And he said, Cynthia Miller. Which was

[10] everything that I had been doing since I started

[11] there. Scheduling travel, managing the

[12] calendar, preparing the speeches, doing anything

[13] and everything that the executive director

[14] wanted. Being the executive director's

[15] assistant. Basically.

[16] **Q:** Let's go back and look at paragraph 10.

[17] **A:** Where is that?

[18] **Q:** That's the last one, "For reasons

[19] stated above, I feel that my race, Caucasian,

[20] and religion, Catholic."

[21] **A:** Okay, okay, okay.

[22] **Q:** Okay? "Were the reasons for this

Page 41

[1] employment decision." By "employment decision,"
[2] you mean the fact that your job duties changed
[3] after November 23rd, 2005, correct?
[4] A: The use of the word "changed" is not
[5] accurate.
[6] Q: Okay.
[7] A: Removed from my job is more accurate,
[8] and I think I repeated that all through. I
[9] believe that religion is a principal basis for
[10] removing me from my duties, he didn't type it
[11] out right, but removing me from my duties. I —
[12] there was no change — what did you say, how did
[13] you — what was the word you used?
[14] Q: I said your job duties changed.
[15] A: Changed. I wasn't given any duties,
[16] afterwards.
[17] Q: But you did participate in the
[18] electronic filing and archiving, correct?
[19] A: Yes.
[20] Q: So, describe the duties that you were
[21] able to perform after November 23rd, 2005, as a
[22] staff assistant.

Page 42

[1] A: I, like I said, I prepared a roadmap to
[2] move some files around, in the electronic filing
[3] system. That took about two weeks. And changed
[4] the color of the filing drawer folders, which
[5] took about four weeks.
[6] Q: And what else did you do?
[7] A: That was it.
[8] Q: Okay. Then you say, "I believe
[9] that" — this is paragraph 10 — "I believe that
[10] because Mr. Franklin has made it clear that he
[11] and Cynthia Miller are 'saved'." Is the fact
[12] that Mr. Franklin said he and Cynthia Miller
[13] were saved, is that all that you're relying on
[14] to differentiate your religion from theirs?
[15] A: Yes. Plus the fact that in their
[16] answers, they both, I believe they both
[17] professed to be something other than Catholic.
[18] Q: Okay. Let's talk about damages. What
[19] are you asking for?
[20] A: Due to the fact that I was dead-ended
[21] in my job, I'm asking for one year's salary, as
[22] settlement.

Page 43

[1] Q: Okay, I'm not asking what you're asking
[2] to settle the case.
[3] A: Well, what I mean by settlement, is
[4] because when we went through the informal stage,
[5] they offered me three months severance pay. I'm
[6] not looking for severance pay, I'm looking for
[7] lump sum. I don't want a paycheck.
[8] Q: So, you're asking for a lump sum
[9] payment?
[10] A: Yes.
[11] Q: Of?
[12] A: One year's salary.
[13] Q: That is the relief that you are asking
[14] for?
[15] A: Yes. Which is $65,048.
[16] Q: Okay.
[17] A: Plus attorneys' fees.
[18] Q: Okay.
[19] A: And medical bills.
[20] Q: Reimbursement for medical bills?
[21] A: Yes. Well, payment for.
[22] Q: Which medical bills?

Page 44

[1] A: Medical bills that for being
[2] hospitalized after I had to leave my job.
[3] Q: How long were you hospitalized?
[4] A: For three days.
[5] Q: Where were you hospitalized?
[6] A: George Washington University Hospital.
[7] Q: As an inpatient, so you were in the
[8] hospital for three days?
[9] A: Yes.
[10] Q: Which physicians did you see?
[11] A: I don't have their names.
[12] Q: Can you give me that information?
[13] A: I can.
[14] Q: Okay. What were you treated for?
[15] A: Severe depression and anxiety disorder.
[16] Or they didn't say disorder, severe depression
[17] and anxiety, major depressed and anxiety
[18] disorder I think is what it would be.
[19] Q: Major depression and anxiety disorder?
[20] A: Correct.
[21] Q: So, have you ever been hospitalized
[22] before?

Page 45

[1] **A:** For the same condition?

[2] **Q:** Yes.

[3] **A:** No.

[4] **Q:** But you have been hospitalized before?

[5] **A:** When I was a child, yes.

[6] **Q:** Do you have any credit card debt?

[7] **A:** I don't understand why that's being

[8] asked.

[9] **Q:** Well, I'm just asking because you were

[10] diagnosed with depression and anxiety disorder,

[11] so I just want to know everything, if you're

[12] going to make this claim, that I have a right

[13] through the discovery process to everything that

[14] relates.

[15] **A:** I don't think that credit card debt

[16] relates to anything. I was hospitalized because

[17] of three years of abuse is the reason why, and

[18] it came to the point that I had to leave my job,

[19] and I'm about to lose my apartment, that's

[20] what's pertinent.

[21] **Q:** So, when did you get notice about

[22] losing your apartment?

Page 46

[1] **A:** I didn't pay July, August and September

[2] rent.

[3] **Q:** You didn't pay?

[4] **A:** July, August and September rent.

[5] Because they're refusing to pay unemployment

[6] compensation.

[7] **Q:** When did you go to the hospital for the

[8] three-day visit at George Washington? When were

[9] you admitted?

[10] **A:** August 1st.

[11] **Q:** When were you released?

[12] **A:** August 4th.

[13] **Q:** So, would you say that your outside

[14] relationships with your friends and family are

[15] good?

[16] **A:** Yes.

[17] **Q:** So, you're not having any difficulty

[18] with that?

[19] **A:** No.

[20] **Q:** So, are you waiving your claim for

[21] compensatory damages?

[22] **A:** No.

Page 47

[1] **Q:** No. So, you are asking for

[2] compensatory damages?

[3] **A:** Yes.

[4] **Q:** In what amount?

[5] **A:** Whatever medical bills and other

[6] expenses that I incurred during this whole

[7] bloody, excuse my language, process.

[8] **Q:** Are you on medication now?

[9] **A:** Yes.

[10] **Q:** So, what type of medication are you

[11] taking?

[12] **A:** It's for depression and anxiety.

[13] **Q:** Can you tell me the name of the drug?

[14] **A:** No, I'm not sure. I am not sure.

[15] Generic names, I don't know what they are

[16] exactly. One's for depression and one's for

[17] anxiety.

[18] **Q:** How often do you take this medication?

[19] **A:** Every day.

[20] **Q:** When did you start taking this

[21] medication?

[22] **A:** August 3rd.

Page 48

[1] **Q:** Can you get me the names of the

[2] medication?

[3] **A:** You mean can I find out what they are?

[4] **Q:** Um-hmm.

[5] **A:** Yeah, I can find them, I have them.

[6] **Q:** And you have a prescription to take

[7] this medication for how long?

[8] **A:** Well, it's every 30 days I have to go

[9] back to a doctor.

[10] **Q:** Every 30 days you revisit the doctor?

[11] **A:** Yes.

[12] **Q:** That originally prescribed?

[13] **A:** Not the one that originally prescribed,

[14] no.

[15] **Q:** Who are you seeing, then?

[16] **A:** It's a doctor, it depends. It's the —

[17] it's a clinic at Howard University, so it

[18] depends upon — it's like an intern thing.

[19] **Q:** How many times have you been to this

[20] clinic?

[21] **A:** Just once.

[22] **Q:** How many times have you had this

Page 49

[1] prescription refilled?

[2] **A:** Twice.

[3] **Q:** How have you had it refilled twice if

[4] you've been once?

[5] **A:** Well, the doctor that I saw at Howard

[6] University prescribed or refilled it

[7] automatically for me the first time that I —

[8] when I got a doctor's appointment, then they

[9] gave me a new prescription.

[10] **Q:** A new prescription meaning for the same

[11] two medications?

[12] **A:** Yes.

[13] **Q:** Have you seen any other doctors?

[14] **A:** No.

[15] **Q:** Have you been to the hospital since

[16] that first visit on August 1st?

[17] **A:** No.

[18] **Q:** Have you sought new employment?

[19] **A:** Yes.

[20] **Q:** When did you begin seeking new

[21] employment?

[22] **A:** The first week of July.

Page 50

[1] **Q:** How often have you sought employment?

[2] **A:** Almost weekly up until the point where

[3] I just shortly after I was hospitalized. I

[4] wasn't really in any condition to be searching

[5] for work. I mean, I was doing my regular online

[6] search with Monster and that kind of thing to

[7] find employment, but I — it's come to the point

[8] that I'm going to have to move with family,

[9] because of this situation, so —

[10] **Q:** Locally?

[11] **A:** No.

[12] **Q:** Where are you moving?

[13] **A:** I am not sure.

[14] **Q:** Okay. So, you sought — you began

[15] seeking employment since the first week of July.

[16] **A:** Yes.

[17] **Q:** But terminated your search when you

[18] were hospitalized in August?

[19] **A:** I didn't say I terminated it, I said I

[20] slowed down.

[21] **Q:** You slowed down, on your "aggressive"

[22] employment search?

Page 51

[1] **A:** Yes.

[2] **Q:** So, you've continuously — have you

[3] gone on any interviews?

[4] **A:** Yes.

[5] **Q:** When did you go on an interview?

[6] **A:** Well, with — mostly with agencies, not

[7] a job to job. Not a — like a job — not like a

[8] real job, but with employment agencies. My

[9] background is actually in IT marketing, so I've

[10] interviewed with a few firms that help assist

[11] people with securing employment in the marketing

[12] field. As well as a couple of temporary

[13] agencies. Normally you can get jobs right away,

[14] and it hasn't happened. So —

[15] **Q:** But how many interviews would you say

[16] you've gone on?

[17] **A:** At least four.

[18] **Q:** Have you received any offers for

[19] employment?

[20] **A:** No.

[21] **Q:** And you said you've interviewed with

[22] temporary employment agencies?

Page 52

[1] **A:** Yes.

[2] **Q:** And what else?

[3] **A:** With employment — well, employment

[4] agencies that specialize in marketing jobs.

[5] **Q:** Okay, employment agencies, what are the

[6] names of those agencies?

[7] **A:** Staff — I don't remember. I didn't

[8] bring those notes. I'm sorry.

[9] **Q:** Okay.

[10] **A:** It's downtown, here.

[11] **Q:** Let's see, so let me just recap what

[12] you're saying about your damages. You're asking

[13] for compensatory damages.

[14] **A:** Yes.

[15] **Q:** You are asking that all of your medical

[16] expenses, including your medical bills, be

[17] reimbursed?

[18] **A:** Yes.

[19] **Q:** And you are asking —

[20] **A:** Not reimbursed, paid for.

[21] **Q:** Paid for.

[22] **A:** Because they're not — they're — my

Page 53

[1] stay in the hospital isn't covered under my
[2] insurance, so I have a $2,000 plus bill.
[3]    Q: Okay, and you're asking for a lump sum
[4] payment of one's year's salary and attorneys'
[5] fees?
[6]    A: Yes.
[7]    Q: I would like to talk about the amended
[8] complaint. I would like to introduce into
[9] evidence as Exhibit A your amended complaint.
[10]    (Exhibit Number A was marked for
[11] identification.)
[12]            BY MS. HIGGINS:
[13]    Q: Can you scan over this amended
[14] complaint, just read it and identify it and tell
[15] us whether this is your amended complaint that
[16] you filed with the court and served on me,
[17] August 28th, 2006.
[18]    A: Yes.
[19]    Q: The last sentence of the complaint
[20] states, "The situation became unbearable and
[21] severely affected my health." What situation
[22] became unbearable?

Page 54

[1]    A: The situation of having to go to work
[2] and sit in an office, kind of like a prison
[3] cell, and have absolutely no contact with anyone
[4] in the office. Basically just imprisoned and
[5] alienated to the point that it was like worse
[6] than being in this room, because it was so
[7] small, eight hours a day.
[8]    Q: What was so small, your office?
[9]    A: Right. I basically looked at a wall
[10] and out my window I saw another building. So,
[11] it was kind of like a little prison cell.
[12]    Q: Okay. So, is that what you're
[13] describing as the unbearable situation?
[14]    A: Well, that and the fact that Darren
[15] Franklin all of the sudden wanted to meet with
[16] me about my job duties for some reason, and it
[17] had come to the point that —
[18]    Q: When was this?
[19]    A: I have the — mid-June.
[20]    Q: And why was this unbearable?
[21]    A: Because of the fact of the way that he
[22] treated me. He treated me like — like a child,

Page 55

[1] or like — he never had a kind word to say,
[2] that's all I have to say. And it just, you
[3] know, due to the fact of the situation where he
[4] took my job away, I just basically lost all
[5] respect for him, and in my resignation notice, I
[6] said that — I said, and this is exactly the way
[7] I feel, I lost all trust for him when he did
[8] what he did, and took my job away from me. And
[9] when I read his answers and affidavits in the
[10] report of investigation, where he made up
[11] stories and lies, making up statements or job
[12] titles like executive secretariat, which I've
[13] never heard of before, ever, and even coming to
[14] the point where he denied meeting with me on
[15] November 23rd. I just lost all — I just
[16] couldn't bear to look at him.
[17]    Q: Okay.
[18]    A: He had some sort of — something
[19] against me, and I just couldn't deal with it
[20] anymore. I got up, every morning, I mean, for
[21] the weeks prior to leaving, I was out sick at
[22] least once a day, because I just couldn't go

Page 56

[1] in —
[2]    Q: Once a day?
[3]    A: Once a week, I'm sorry. And it just
[4] got completely unbearable. I couldn't deal with
[5] it, you know.
[6]    Q: Deal with?
[7]    A: Being imprisoned, being around people
[8] that dislike me for no reason, it was just ugly,
[9] with a capital U.
[10]    Q: Now, when you say — let's go back to
[11] this, because I don't think we've connected it
[12] completely. Darren Franklin wanted to meet with
[13] you about your job duties in mid-June?
[14]    A: Um-hmm. Yes.
[15]    Q: Where were you going with that?
[16]    A: Well, my first reaction was why, why do
[17] you want to meet, after you haven't spoken to me
[18] for over three months. And no one had spoken to
[19] me, so my concern was that he was going to let
[20] me go or something like that. It was just, I
[21] was just in major panic and anxiety. So then
[22] with —

Page 57

[1] **Q:** So, did you meet with him?

[2] **A:** No, I did not. So, then knowing that

[3] the EEOC process was going on, I sent him an

[4] email saying I would rather have a mediator or

[5] someone sit in with us due to this process,

[6] because it's against him, so anything that he

[7] would say, I know that I would have to repeat,

[8] and again, it would be a meeting between him and

[9] me. So, to protect myself, that's what I was

[10] asking for. But then when I spoke with Avis

[11] Johnson, GSA, she said, oh, you don't want to do

[12] that, because that would be considered, what do

[13] they call it, insubordination. And I said,

[14] yeah, well, okay.

[15]     So then I sent him a note saying, okay,

[16] I'll meet with you. So, I was supposed to meet

[17] with him on Friday, that was the Friday before

[18] the 4th of July, and I called in sick again. I

[19] just couldn't — I just couldn't face him.

[20] Period. I just couldn't deal with talking with

[21] him. There was no reason for us to talk. He

[22] had already done the damage, and there was

Page 58

[1] nothing — there was no job for me. If I was

[2] hired — I was not hired by him, is the number

[3] one thing. I was hired by Philip Mangano and

[4] Mary Ellen Holmes, originally under the

[5] direction of Margaretta Kennedy. He put himself

[6] in the position of being my supervisor, and gave

[7] me nothing to do. He used me as a puppet or a

[8] toy when he needed something.

[9]     So, it wasn't — it's very difficult

[10] for me to explain in words, but I was in the

[11] hospital, so that's enough. Enough said.

[12] **Q:** So, you would say it severely affected

[13] your health because you were —

[14] **A:** Because I was suffering from anxiety

[15] and severe depression, because of the whole

[16] thing. And it didn't just, like I said, it just

[17] didn't start that month, it had been going on

[18] for a long time.

[19] **Q:** What do you mean by a long time? The

[20] anxiety and the depression were going on for a

[21] long time?

[22] **A:** No, no, no, no.

Page 59

[1] **Q:** When did that start?

[2] **A:** The ill treatment started way back a

[3] long time ago.

[4] **Q:** When did your anxiety and depression

[5] start?

[6] **A:** Well, I had started having — there was

[7] a week in September.

[8] **Q:** '06?

[9] **A:** Of '05.

[10] **Q:** '05, okay.

[11] **A:** Where I got to the point where I

[12] couldn't go in, I was having anxiety attacks,

[13] and I went to the hospital then, and they

[14] prescribed me some medication to relieve my

[15] anxiety so that I could actually get back to

[16] work, because of the abusive way that I was

[17] being treated by Mary Ellen Holmes, the deputy

[18] director.

[19] **Q:** So, you — wait a second, I thought you

[20] were only hospitalized in — from August 1st to

[21] 4th of 2006. So, now you're telling me you were

[22] hospitalized —

Page 60

[1] **A:** No, I didn't say hospitalized, the word

[2] was I went to the hospital.

[3] **Q:** You went to the hospital?

[4] **A:** Yes.

[5] **Q:** Meaning as an outpatient?

[6] **A:** I went to the emergency room, yes.

[7] **Q:** Okay, you went to the emergency room.

[8] Do you know the specific date, by chance?

[9] **A:** It was mid-September.

[10] **Q:** Okay, you went to which hospital?

[11] **A:** George Washington University Hospital.

[12] **Q:** ER, right?

[13] **A:** Yes.

[14] **Q:** Was this on a weekday?

[15] **A:** Yes.

[16] **Q:** Okay, and they diagnosed you with

[17] anxiety?

[18] **A:** Well, acute anxiety.

[19] **Q:** And they — what did they do, did they

[20] treat you? Did they give you any medication?

[21] **A:** Yeah, like I said, they gave me some

[22] medication so that I could get back to work.

Page 61

[1] **Q:** Did you go back to work that day?

[2] **A:** No. The following week.

[3] **Q:** The following week?

[4] **A:** I was out for a week.

[5] **Q:** So, you would say that the situation

[6] started affecting you in September 2005,

[7] affecting your health in September 2005?

[8] **A:** Yes.

[9] **Q:** Then after your visit in September

[10] 2005, did you have — did you get that — I

[11] don't know, did they give you a prescription for

[12] some medicine?

[13] **A:** Yes. I had it filled and I took it,

[14] and that was it.

[15] **Q:** So, you were taking this medication

[16] periodically?

[17] **A:** Well, for the first week, getting back

[18] to work, I was out of work for a week. There

[19] was an incident with Mary Ellen Holmes that sort

[20] of was almost equal to the incident which I

[21] mentioned where Philip Mangano said if you

[22] wanted to — if you had a bullet in a gun and it

Page 62

[1] was to my head, that he would pull the trigger.

[2] She belittled me, completely uncalled for, and

[3] because it was — anyone that I explained this

[4] to, and I've never been in any kind of abusive

[5] relationship, or had abusive parents or abusive

[6] grandparents, nothing like that. It's like I've

[7] been abused, okay, for the past three years.

[8] Period. And for no reason of my own.

[9] And so, you know, there's only so much

[10] a person can take. I — you know, and I needed

[11] the job, it's obvious I needed the job, I can't

[12] find another job, you know, I was basically

[13] living paycheck to paycheck, and so I — that's

[14] the only reason I stayed on, but it got to the

[15] point that it affected my health. There's

[16] really nothing else that I can really say about

[17] it. You know.

[18] **Q:** So, you're saying that it started to

[19] affect your health in September 2005 when you

[20] went to the GW emergency room, you were told

[21] that you had anxiety, acute anxiety.

[22] **A:** Yes.

Page 63

[1] **Q:** You were given a prescription for

[2] medication.

[3] **A:** Yes.

[4] **Q:** You began taking that medication?

[5] **A:** Yes.

[6] **Q:** You reported back to work the next

[7] week?

[8] **A:** Yes.

[9] **Q:** And you've been on that medication for

[10] how long?

[11] **A:** It was just like maybe two weeks worth.

[12] **Q:** Two weeks?

[13] **A:** Right.

[14] **Q:** Then you stopped taking the medication?

[15] **A:** Yes.

[16] **Q:** Okay. That would put us, I would say,

[17] maybe in October of 2005?

[18] **A:** Yes.

[19] **Q:** Did you take any medication October

[20] 2005?

[21] **A:** No.

[22] **Q:** November 2005?

Page 64

[1] **A:** No.

[2] **Q:** Okay, did you see any doctors in

[3] October and November of 2005?

[4] **A:** No.

[5] **Q:** Okay, December 2005, did you —

[6] **A:** Oh, whoa, wait a minute. I had an ear

[7] infection in December. Or the following.

[8] **Q:** Would you say that was a result of your

[9] employment?

[10] **A:** No, but you asked me if I saw any

[11] doctors.

[12] **Q:** That's great, I want you to answer

[13] everything. Okay, November 2005, did you take

[14] any medication or see any doctors?

[15] **A:** In November of 2005?

[16] **Q:** Um-hmm.

[17] **A:** No.

[18] **Q:** December of 2005, did you take any

[19] medication or see any doctors?

[20] **A:** Yes. Antibiotics for an ear infection.

[21] **Q:** January 2006, did you take any

[22] medication or see any doctors?

Page 65

[1]  **A:** No.

[2]  **Q:** February 2006, did you take any

[3]  medication or see any doctors?

[4]  **A:** No.

[5]  **Q:** March 2006, did you take any medication

[6]  or see any doctors?

[7]  **A:** No.

[8]  **Q:** In April 2006, did you take any

[9]  medication or see any doctors?

[10]  **A:** No.

[11]  **Q:** In May 2006, did you take any

[12]  medication or see any doctors?

[13]  **A:** Well, during — there were several

[14]  instances during those months where I saw a

[15]  chiropractor, but never —

[16]  **Q:** Okay. Would you relate seeing a

[17]  chiropractor to the fact that you were under

[18]  severe, let's see what you say, that your

[19]  situation at work became unbearable?

[20]  **A:** No.

[21]  **Q:** Okay. In May 2006, did you take any

[22]  medications or see a doctor?

Page 66

[1]  **A:** No.

[2]  **Q:** In June 2006, did you take any

[3]  medications or see a doctor?

[4]  **A:** No.

[5]  **Q:** In July of 2006, did you take any

[6]  medications or see a doctor or any other type of

[7]  health professional?

[8]  **A:** No.

[9]  **Q:** Okay. All right, do you have anything

[10]  else that you need to say?

[11]  **A:** That I need to say?

[12]  **Q:** Well, do you have any —

[13]  **A:** There's plenty I could say.

[14]  **Q:** Do you have anything else that you need

[15]  to — you're right, let me clarify that, about

[16]  the health condition is what I'm referring to.

[17]  **A:** No.

[18]  **Q:** Okay, then that's all I have at this

[19]  time.

[20]  (Whereupon, at 2:33 p.m., the

[21]  deposition was concluded.)

[22]

Page 67

[1]  DISTRICT OF COLUMBIA, to wit:

[2]

   I, Sally Jo Bowling, the officer before

[3]  whom the foregoing deposition was taken, do
   hereby certify that the within-named witness

[4]  personally appeared before me at the time and
   place herein set out, and after having been duly

[5]  sworn by me, according to law, was examined by
   counsel.

[6]

   I further certify that the examination

[7]  was recorded stenographically by me and this
   transcript is a true record of the proceedings.

[8]

   I further certify that I am not of

[9]  counsel to any of the parties, nor an employee
   of counsel, nor related to any of the parties,

[10]  nor in any way interested in the outcome of this
   action.

[11]

   As witness my hand and notarial seal

[12]  this 12th day of October, 2006.

[13]

[14]

[15]

[16]       Sally Jo Bowling
         Notary Public

[17]

[18]

[19]  MY COMMISSION EXPIRES:

[20]       10/14/07

[21]

[22]

Page 68

[1]          INDEX

[2]     DEPOSITION OF GARY I. CHRISTIAN

[3]        OCTOBER 4, 2006

[4]

[5]  EXAMINATION                    PAGE

[6]  GARY I. CHRISTIAN                4

[7]

[8]

[9]  EXHIBITS MARKED                PAGE

[10]  Number A                      53

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

## $

**$2,000** 53:2
**$65,048** 43:15

## 0

**05** 59:9, 10
**06** 59:8

## 1

**10** 40:16; 42:9
**1994** 5:15, 16
**1st** 25:9, 12; 46:10; 49:16; 59:20

## 2

**2000** 25:12
**2004** 12:18
**2005** 12:12, 20; 21:3, 15; 22:9; 23:3; 25:1, 13, 14; 30:3; 34:13; 37:5, 9, 21; 41:3, 21; 61:6, 7, 10; 62:19; 63:17, 20, 22; 64:3, 5, 13, 15, 18
**2006** 11:5; 26:14; 27:13, 16; 53:17; 59:21; 64:21; 65:2, 5, 8, 11, 21; 66:2, 5
**23rd** 12:11, 20; 21:3, 15; 22:9; 23:3; 30:2; 37:5, 9, 21; 41:3, 21; 55:15
**28th** 53:17
**2:00** 13:3
**2:33** 66:20

## 3

**30** 48:8, 10
**31st** 27:8, 13, 16
**3rd** 47:22

## 4

**4** 11:17; 15:18
**4th** 46:12; 57:18; 59:21

## 5

**5** 20:18; 24:17
**570-2006-00528X** 3:16; 9:10

## 6

**6** 29:6, 8; 30:16
**6th** 11:5

## 7

**7** 34:9

## 8

**8** 37:20

## 9

**9** 8:14
**92** 8:14, 15

## A

**ability** 4:15
**able** 41:21
**above** 40:19
**absolutely** 54:3
**abuse** 45:17
**abused** 62:7
**abusive** 32:17; 59:16; 62:4, 5, 5
**accept** 10:2; 17:11
**accessible** 34:20
**accommodations** 35:13
**accurate** 41:5, 7
**accused** 5:9
**acquaintances** 31:1
**across** 17:4
**action** 6:6
**actually** 51:9; 59:15
**acute** 60:18; 62:21
**added** 34:15; 36:17
**administrator** 11:21; 12:9, 13; 35:9
**admitted** 46:9
**advocate** 32:20
**affect** 4:14; 62:19
**affected** 53:21; 58:12; 62:15
**affecting** 61:6, 7
**affidavit** 10:13; 11:2, 5, 10, 12, 17; 15:18; 20:19
**affidavits** 55:9
**African-American** 17:1
**afternoon** 3:5; 13:3
**afterwards** 41:16
**Again** 38:5, 20; 40:5; 57:8, 18
**against** 6:6; 9:16; 55:19; 57:6
**agencies** 51:6, 8, 13, 22; 52:4, 5, 6
**aggressive** 50:21
**ago** 59:3
**alert** 28:1
**alienated** 24:3; 54:5
**alleging** 9:14; 20:15
**Almost** 50:2; 61:20

**always** 36:1, 14, 20
**amended** 53:7, 9, 13, 15
**amongst** 22:1; 30:11
**amount** 36:16; 47:4
**analyst** 21:2, 5; 29:9, 14; 37:17; 38:14, 16
**answered** 19:22; 20:2; 38:18
**Antibiotics** 64:20
**anxiety** 44:15, 17, 17, 19; 45:10; 47:12, 17; 56:21; 58:14, 20; 59:4, 12, 15; 60:17, 18; 62:21, 21
**anymore** 18:14; 55:20
**apartment** 45:19, 22
**appointment** 49:8
**April** 11:5; 36:7; 65:8
**archiving** 41:18
**Arlington** 6:1, 2
**around** 19:11; 42:2; 56:7
**arrangements** 21:8, 17
**arrested** 5:1
**assist** 51:10
**assistant** 13:22; 14:17; 15:10, 16; 21:12; 38:4; 40:15; 41:22
**assume** 7:2
**atmosphere** 32:16; 33:3, 7
**attacks** 59:12
**attention** 10:12; 11:17
**attorney** 7:2, 4
**attorneys** 43:17; 53:4
**August** 46:1, 4, 10, 12; 47:22; 49:16; 50:18; 53:17; 59:20
**authorization** 35:11; 36:2, 8
**authorizations** 34:16; 35:2; 36:21
**automatically** 49:7
**available** 21:19; 22:1, 4
**Avis** 57:10
**away** 19:2; 29:10; 39:22; 40:6; 51:13; 55:4, 8

## B

**back** 12:18; 14:12; 15:17; 25:10, 15; 26:16; 29:2; 35:19, 19; 39:18, 20; 40:1, 16; 48:9; 56:10; 59:2, 15; 60:22; 61:1, 17; 63:6
**background** 51:9
**based** 8:9; 20:14, 15; 31:11
**basically** 14:2, 16; 15:16; 23:11; 26:5; 39:2, 13; 40:15; 54:4, 9; 55:4; 62:12
**basing** 20:13
**basis** 6:9; 9:16; 41:9
**bear** 55:16
**became** 15:9; 21:12;

**always** 23:15; 29:15; 31:9; 53:20, 22; 65:19
**become** 29:14; 33:10
**began** 50:14; 63:4
**begin** 34:17; 49:20
**beginning** 35:8
**belittled** 62:2
**better** 19:6
**bill** 53:2
**bills** 43:19, 20, 22; 44:1; 47:5; 52:16
**black** 15:19; 30:18
**bloody** 47:7
**blue** 36:6
**board** 31:10
**bond** 33:11
**both** 42:16, 16
**break** 4:1; 13:2
**briefing** 34:18; 37:2, 6, 9
**briefly** 24:15
**bring** 10:10; 52:8
**brought** 12:8, 14; 30:21; 31:10
**Building** 24:22; 54:10
**bullet** 61:22
**bullying** 36:3
**burden** 34:15; 36:17
**business** 30:12

## C

**cabinet** 23:7
**calendar** 15:14; 21:9, 21; 34:20; 37:3, 7; 40:12
**call** 10:12; 11:16; 17:14; 57:13
**called** 4:7; 5:19; 37:22; 57:18
**came** 13:4; 26:3, 5; 27:1, 3; 40:1; 45:18
**can** 10:22; 11:4; 12:2; 19:1; 27:18; 33:5; 35:13, 14, 16; 40:5; 44:12, 13; 47:13; 48:1, 3, 5; 51:13; 53:13; 62:10, 16
**capital** 56:9
**card** 45:6, 15
**Caroline** 3:6
**case** 3:12, 15; 7:9; 9:9, 10; 10:9; 43:2
**Catholic** 9:18, 21; 15:20; 19:11; 40:20; 42:17
**Caucasian** 34:17; 37:12; 40:19
**cell** 54:3, 11
**certain** 24:8
**chance** 31:1; 60:8
**change** 35:16; 36:15; 41:12
**changed** 41:2, 4, 14, 15; 42:3
**changes** 13:19; 36:1, 16
**changing** 23:6; 26:5;

**35:17
**child** 45:5; 54:22
**chiropractor** 65:15, 17
**choice** 30:5
**Christ** 10:2; 17:11
**Christian** 3:5, 13; 4:6; 9:20, 21; 19:6, 10
**Christianity** 19:8
**Church** 7:2
**civil** 5:6
**civilly** 5:3
**claim** 9:15; 45:12; 46:20
**claimed** 11:9
**clarify** 3:19; 66:15
**class** 6:6, 8, 12
**clean** 25:2
**clear** 17:20; 18:3; 30:20; 38:6; 42:10
**clinic** 48:17, 20
**college** 26:1
**color** 26:6; 27:4; 42:4
**coming** 55:13
**Commission** 3:11
**company** 5:19; 6:14; 7:12, 14, 16, 19, 21
**Compensation** 8:22; 46:6
**compensatory** 46:21; 47:2; 52:13
**complain** 12:2
**complained** 11:20
**complaint** 3:10; 9:5, 8, 11, 15; 53:8, 9, 14, 15, 19
**complete** 27:5
**completed** 25:5
**completely** 24:3; 56:4, 12; 62:2
**concern** 56:19
**concluded** 66:21
**condition** 45:1; 50:4; 66:16
**confirm** 31:7
**confirmation** 35:12
**confused** 7:21
**connected** 56:11
**connection** 3:9
**considered** 57:12
**constant** 35:22
**contact** 33:10; 54:3
**continually** 35:16, 17
**continuously** 51:2
**contract** 30:21
**conversations** 18:22; 20:7; 31:2, 14; 39:14
**convicted** 4:17, 20
**copy** 10:7; 11:13; 14:11, 11; 39:20
**correctly** 6:8; 20:9
**correspondence** 28:22; 29:4
**Council** 3:7, 15
**couple** 25:3; 26:7; 51:12

court 5:4; 6:22; 53:16
covered 53:1
coworkers 22:5, 6, 14; 38:10
create 3:21
credit 45:6, 15
criminal 5:7
current 38:3, 13, 14
currently 21:14
Cynthia 14:9; 15:3, 4; 17:7; 18:15, 16; 21:18, 19, 21, 22; 24:10; 29:12, 14; 30:4; 34:14, 19; 39:16; 40:9; 42:11, 12

**D**

damage 57:22
damages 42:18; 46:21; 47:2; 52:12, 13
Darren 11:20; 12:12; 15:19; 16:21; 18:6; 23:16; 24:17; 25:4, 16; 40:7; 54:14; 56:12
date 7:1; 60:8
dates 8:16
day 27:19, 19; 28:8; 31:16, 18; 35:14, 15; 38:10; 47:19; 54:7; 55:22; 56:2; 61:1
days 25:4; 44:4, 8; 48:8, 10
dead-ended 42:20
deal 55:19; 56:4, 6; 57:20
debt 45:6, 15
December 25:8, 12; 64:5, 7, 18
decided 13:18
decision 11:19; 12:1, 3, 4; 41:1, 1
define 17:15, 16
definition 17:16
denied 55:14
depends 48:16, 18
deponent 4:13
deposition 3:18; 66:21
depressed 44:17
depression 44:15, 16, 19; 45:10; 47:12, 16; 58:15, 20; 59:4
deputy 25:5; 32:19, 19; 34:13; 59:17
describe 14:18; 27:19; 41:20
describing 54:13
description 13:21, 22; 14:12, 18, 20; 38:4, 22; 39:3, 18
desk 14:14; 30:6; 39:3, 5, 19, 20
detail 18:20
devil's 32:20
diagnosed 45:10; 60:16

different 17:13, 20; 30:11
differentiate 42:14
difficult 58:9
difficulty 46:17
direct 12:9; 19:13
direction 58:5
directly 16:4, 6; 19:21; 20:5
Director 3:14; 12:10, 11; 15:16; 25:5; 32:17, 19, 20; 34:13, 19; 40:13; 59:18
director's 15:13; 21:8; 35:12; 40:14
discovery 45:13
discriminated 9:16
discrimination 3:10; 20:14, 15
discuss 12:1
dislike 56:8
disorder 44:15, 16, 18, 19; 45:10
distributed 30:4, 10
doctor 48:9, 10, 16; 49:5; 65:22; 66:3, 6
doctor's 49:8
doctors 49:13; 64:2, 11, 14, 19, 22; 65:3, 6, 9, 12
done 21:10; 25:7; 26:21; 36:3, 4, 8, 14; 57:22
down 26:3; 50:20, 21
downtown 52:10
drawer 42:4
drink 17:8; 18:13
drive 25:2
drug 47:13
due 13:6; 34:15; 35:22; 42:20; 55:3; 57:5
duly 4:8
during 3:17; 23:19; 47:6; 65:13, 14
duties 12:16; 14:19; 20:21; 21:4, 11, 16; 27:20; 29:10, 11, 19; 30:14; 37:4; 38:15; 39:16; 40:6; 41:2, 10, 11, 14, 15, 20; 54:16; 56:13
duty 21:13; 37:8, 14

**E**

e.g 24:18
ear 64:6, 20
early 13:2; 38:1
eats 32:3
EEO 9:5, 8, 10, 11
EEOC 3:15; 23:20; 57:3
eight 54:7
either 28:11
electronic 23:8; 41:18; 42:2
Ellen 25:4; 28:5; 34:14; 58:4; 59:17; 61:19
else 12:5, 21; 17:19; 18:1,

11; 21:22; 22:4, 4, 13, 13; 23:12; 33:14, 20; 42:6; 52:2; 62:16; 66:10, 14
email 24:9; 25:16, 22; 28:14, 17, 22; 57:4
emails 26:16; 35:20
emergency 60:6, 7; 62:20
employed 7:12
employee 8:6, 7, 8; 30:22; 33:9, 19
employees 32:6
employer 5:11, 18; 8:1, 2
employment 3:9; 41:1, 1; 49:18, 21; 50:1, 7, 15, 22; 51:8, 11, 19, 22; 52:3, 3, 5; 64:9
ending 27:13
enough 58:11, 11
entirely 29:12
Equal 3:11; 61:20
ER 60:12
even 7:20; 19:8; 55:13
everybody 32:3; 34:20
everyone 32:3; 34:20
everyone's 19:19; 25:3; 31:5
evidence 23:21; 53:9
evil 19:1
exactly 12:2; 13:16; 15:4; 18:5; 24:20; 30:19; 32:14; 47:16; 55:6
EXAMINATION 3:3; 4:7
examined 4:8
exciting 5:20
excuse 47:7
executed 11:4, 7
Executive 3:14; 12:10; 15:13, 15; 21:7; 32:16; 34:18; 35:12; 40:13, 14; 55:12
Exhibit 53:9, 10
expenses 47:6; 52:16
explain 12:2; 58:10
explained 26:22; 30:1; 35:7, 18; 36:10, 13; 62:3
explaining 25:18
explanation 29:12
extremely 32:17

**F**

F 10:15
F2.c 27:10
face 57:19
fact 11:2; 22:8; 35:22; 41:2; 42:11, 15, 20; 54:14, 21; 55:3; 65:17
faith 30:18
Falls 7:2
family 33:4; 46:14; 50:8
far 16:11; 23:12

February 26:20; 65:2
federal 6:22
feedback 29:1
feel 40:19; 55:7
fees 43:17; 53:5
felony 4:18
few 23:6; 51:10
field 51:12
file 6:21; 26:4
filed 7:20, 22; 8:8; 9:5, 12; 53:16
files 23:8; 25:3, 6, 17, 19, 19; 42:2
filing 14:7; 23:7; 24:18; 25:18; 26:1; 30:7; 39:6; 41:18; 42:2, 4
filled 61:13
find 48:3, 5; 50:7; 62:12
finished 10:16
fired 39:13
firms 51:10
first 4:8, 13; 9:8, 11; 12:1, 9; 25:9; 26:19; 49:7, 16, 22; 50:15; 56:16; 61:17
flights 35:15, 15
folders 23:7; 26:6; 27:4; 42:4
follow-up 28:17
following 61:2, 3; 64:7
follows 4:9
form 36:2
former 8:7, 8
forms 35:11; 36:8
forth 25:16; 26:16; 35:19, 19
foul 32:18
four 6:16, 17; 24:1; 26:8, 9, 13; 35:15; 42:5; 51:17
frame 8:11
Franklin 11:20; 12:12; 13:13; 15:19; 18:6; 19:20; 23:16; 28:13, 14; 30:3, 19; 32:10; 34:13; 35:1, 7; 37:21; 38:6, 9; 40:8; 42:10, 12; 54:15; 56:12
fraud 5:9
Friday 57:17, 17
friends 31:7, 10; 33:4; 46:14

**G**

G 3:13
G3 14:22; 15:1
Gary 3:13; 4:6
gave 10:19; 14:11; 49:9; 58:6; 60:21
general 24:3; 25:2
generic 4:12; 10:17; 47:15
George 44:6; 46:8; 60:11
given 25:3, 21; 33:7; 41:15; 63:1

God 19:13
goes 33:12, 12
good 3:5; 22:10; 46:15
grandparents 62:6
Great 10:11; 18:20; 29:2; 64:12
GSA 57:11
guess 7:1
gun 61:22
GW 62:20

**H**

handed 13:21; 14:17; 15:1; 38:3, 22
handle 21:20
happened 13:10; 16:17; 18:21; 51:14
hard 36:19
hardly 32:21
head 3:22; 62:1
health 53:21; 58:13; 61:7; 62:15, 19; 66:7, 16
hear 25:10
heard 17:1; 29:3; 55:13
hearing 3:11
heaven 19:13
heavily 39:3
help 14:5; 35:2; 51:10
here's 14:11
HIGGINS 3:4, 6; 4:10; 53:12
himself 58:5
hired 58:2, 2, 3
holiday 38:2; 40:2
Holmes 25:5; 28:5; 34:14; 58:4; 59:17; 61:19
holy-roller 17:2
home 10:9; 19:3
Homelessness 3:8, 15
Hospital 44:6, 8; 46:7; 49:15; 53:1; 58:11; 59:13; 60:2, 3, 10, 11
hospitalized 44:2, 3, 5, 21; 45:4, 16; 50:3, 18; 59:20, 22; 60:1
hotel 21:8, 17; 35:13
hotels 35:14
hours 54:7
Howard 48:17; 49:5
HUD 24:22
husband 33:11

**I**

idea 23:1; 25:19
identification 4:2
identify 11:1; 53:14
ill 59:2
impossible 36:20
imprisoned 54:4; 56:7

incident 18:21; 61:19, 20
included 35:20
including 6:17; 22:6, 16; 28:13; 52:16
incurred 47:6
infection 64:7, 20
informal 43:4
information 23:20; 24:11; 44:12
informed 20:11; 34:15; 38:2
inpatient 44:7
instances 65:14
instant 31:9
insubordination 57:13
insurance 53:2
Interagency 3:7, 14
intern 48:18
interrogatories 23:9; 27:9
interview 51:5
interviewed 51:10, 21
interviews 51:3, 15
into 12:8, 14; 16:22; 18:19; 30:7, 10; 33:1, 2, 2; 37:22; 53:8
introduce 53:8
investigation 10:7; 35:21; 55:10
invited 34:1, 4
involved 14:19; 33:18, 21

**J**

January 12:18; 26:13, 14; 64:21
Jesus 10:2; 17:11
job 12:4; 13:20, 21; 14:9, 12, 20; 15:4, 11; 19:1, 2; 21:20; 24:10; 25:11; 26:21; 29:11, 17, 18; 30:2, 9; 38:4, 15, 22; 39:3, 17, 22; 40:7; 41:2, 7, 14; 42:21; 44:2; 45:18; 51:7, 7, 7, 8; 54:16; 55:4, 8, 11; 56:13; 58:1; 62:11, 11, 12
jobs 51:13; 52:4
Johnson 57:11
Judge 3:12
July 46:1, 4; 49:22; 50:15; 57:18; 66:5
June 66:2

**K**

keeping 21:20
Kennedy 35:10; 58:5
kept 21:9; 25:18; 33:18; 37:7
kind 10:1; 15:8; 19:16; 24:10; 26:22; 33:13; 39:14; 50:6; 54:2, 11; 55:1; 62:4

knew 26:2; 31:8
knowing 57:2

**L**

L 7:7, 8
laid 39:3, 18
language 32:18; 47:7
last 20:9; 24:1, 16; 26:19; 27:6, 6; 40:18; 53:19
Later 18:20; 25:15; 30:15
lax 24:10
least 31:6; 51:17; 55:22
leave 13:7, 10; 44:2; 45:18
leaving 55:21
left 7:13, 16, 19, 21; 13:1, 5; 14:12, 15; 40:1
level 12:10
lies 55:11
list 21:4
listed 14:4; 21:13
listen 34:2
little 23:6; 54:11
living 62:13
Locally 50:10
locked 23:11
long 25:20; 33:6, 6; 44:3; 48:7; 58:18, 19, 21; 59:3; 63:10
longer 12:16; 17:9; 22:18; 30:13; 38:2
look 20:18; 28:18; 29:6; 40:16; 55:16
looked 14:2; 28:10; 54:9
looking 11:5; 43:6, 6
lose 45:19
losing 45:22
lost 55:4, 7, 15
lot 23:10
loudly 17:5
lull 26:18
lump 43:7, 8; 53:3
lunch 31:3, 15, 17, 22; 32:1, 3, 5, 7

**M**

M 3:13; 7:7, 8
major 44:17, 19; 56:21
making 16:11, 15; 55:11
managed 21:7
management 11:19
managing 15:14; 34:19; 37:3; 40:11
Mangano 3:13; 58:3; 61:21
manner 36:22
many 6:11; 48:19, 22; 51:15
March 26:19; 27:7, 13, 15; 65:5

Margaretta 35:10; 58:5
marked 53:10
marketing 51:9, 11; 52:4
Mary 25:4; 28:5; 34:13; 58:4; 59:17; 61:19
materials 34:18; 37:3, 6, 9
matter 3:8, 12; 25:7
May 65:11, 21
maybe 63:11, 17
mean 11:8; 12:3; 17:10, 19; 18:19; 19:5, 10, 10; 22:5, 14; 26:15; 29:19; 32:14; 33:21; 38:13; 41:2; 43:3; 48:3; 50:5; 55:20; 58:19
meaning 49:10; 60:5
means 10:2; 17:12; 19:9
mediator 57:4
medical 43:19, 20, 22; 44:1; 47:5; 52:15, 16
medication 4:13; 47:8, 10, 18, 21; 48:2, 7; 59:14; 60:20, 22; 61:15; 63:2, 4, 9, 14, 19; 64:14, 19, 22; 65:3, 5, 9, 12
medications 49:11; 65:22; 66:3, 6
medicine 61:12
meet 38:9; 54:15; 56:12, 17; 57:1, 16, 16
meeting 12:21; 13:11, 14, 17; 26:4; 38:7; 55:14; 57:8
meetings 33:18, 19, 22
mentioned 12:13; 24:15; 61:21
met 25:4; 30:3; 34:14
mid 8:14
mid-'94 8:15
mid-June 54:19; 56:13
mid-September 60:9
Miller 14:9; 15:3, 5; 18:9; 20:4, 6; 21:18, 20, 21, 22; 29:13, 14; 30:4, 8, 17; 32:11; 34:14; 39:16; 40:9; 42:11, 12
Mils 7:5, 6, 7
mine 10:19
minute 64:6
misdemeanors 4:21
money 8:17, 20
Monster 50:6
month 58:17
months 24:1; 43:5; 56:18; 65:14
more 28:15; 30:22; 33:1; 41:7
morgue 33:2
morning 55:20
most 25:7; 31:5
Mostly 31:19; 51:6
move 10:6; 30:7; 39:4, 5; 42:2; 50:8
moved 24:21, 22; 25:11;

40:4
moving 39:7; 50:12
much 62:9
music 17:2
Must 8:14; 13:2
myself 17:14; 22:7; 57:9

**N**

N 3:13, 14
name 7:4; 20:9; 35:9; 47:13
named 8:4
names 44:11; 47:15; 48:1; 52:6
nasty 26:20
need 4:1; 27:2; 39:19; 66:10, 11, 14
needed 14:5; 15:16; 21:10; 34:7; 35:2; 58:8; 62:10, 11
new 13:20, 21; 14:20; 24:21; 25:1; 26:6; 34:6; 38:4, 22; 49:9, 10, 18, 20
news 28:9
next 9:4; 27:14; 30:7; 34:9; 36:20; 39:6; 63:6
none 27:21
normal 32:16
Normally 51:13
note 57:15
notes 52:8
notice 45:21; 55:5
November 12:11, 20; 21:3, 15; 22:9; 23:3; 30:2; 37:5, 9, 21; 41:3, 21; 55:15; 63:22; 64:3, 13, 15
number 3:15; 9:10; 53:10; 58:2

**O**

O 3:14
observation 31:11
obvious 31:6, 8; 33:13, 13; 62:11
occur 5:14
occurred 7:15
October 12:11; 34:12; 36:7; 63:17, 19; 64:3
off 4:11
offer 11:11
offered 43:5
offers 51:18
office 11:21; 12:8, 9, 12, 14; 13:5, 17; 23:4, 12; 30:7; 31:2, 4; 32:15, 21; 33:1; 34:21; 35:9; 37:22; 39:5, 8; 54:2, 4, 8
official 11:19
often 47:18; 50:1
once 48:21; 49:4; 55:22; 56:2, 3

one 3:18; 8:2; 10:8; 12:22, 22; 16:22; 20:11; 21:13; 23:5, 13; 25:22; 28:11; 32:20; 33:5, 12, 12, 20; 35:14, 15; 39:13; 40:18; 42:21; 43:12; 48:13; 53:4; 56:18; 58:3
One's 47:16, 16
one-on-one 31:2
online 50:5
only 13:1, 13; 16:7; 23:13; 29:9; 38:6; 59:20; 62:9, 14
Opportunity 3:11; 25:2
opposed 33:2
organized 25:21
originally 42:13, 13; 58:4
others 19:7
out 22:1; 28:10; 36:5; 41:11; 48:3; 54:10; 55:21; 61:4, 18
outcome 6:19
outpatient 60:5
outside 46:13
over 38:20; 53:13; 56:18
overhear 31:13
overtime 6:5, 9; 8:9, 22
own 62:8

**P**

p.m 66:20
page 11:6, 18; 27:12; 34:10
paid 52:20, 21
panic 56:21
paragraph 11:17; 15:18; 20:18; 24:17; 29:6, 8; 30:15, 16; 34:9; 37:20; 40:16; 42:9
parents 62:5
part 6:8
participate 41:17
party 8:5
past 9:6; 62:7
pay 6:5, 9; 43:5, 6; 46:1, 3, 5
paycheck 43:7; 62:13, 14
paying 6:5
payment 43:9, 21; 53:4
pending 3:10; 9:9
people 6:11, 13; 13:1, 14; 14:5; 22:2, 20; 30:11; 31:5; 32:18; 33:8, 10; 51:11; 56:7
perfectly 17:20; 18:3
perform 29:17, 18; 37:15; 41:21
performed 20:22; 21:11; 22:18, 22; 36:9; 37:4, 10; 38:16
performing 12:16; 21:15; 30:13; 39:16
period 26:17; 30:14;

57:20; 62:8
**periodically** 61:16
**person** 12:13; 23:13;
62:10
**pertinent** 45:20
**Peterson** 7:5, 6, 8
**Philip** 3:13; 58:3; 61:21
**phones** 15:6
**physicians** 44:10
**Pickstock** 12:22; 14:13;
16:3, 9; 20:8; 23:14; 39:21
**place** 29:13; 36:12
**placed** 23:4
**plaintiffs** 6:15
**playing** 17:4
**please** 3:19, 21
**plenty** 66:13
**plots** 19:2
**Plus** 42:15; 43:17; 53:2
**point** 23:15; 26:3, 5, 13;
27:2, 3; 45:18; 50:2, 7;
54:5, 17; 55:14; 59:11;
62:15
**position** 30:17; 38:3, 13,
14; 58:6
**possible** 24:16
**pow-wow** 31:3
**pow-wows** 32:14
**pray** 19:3
**prepare** 22:8; 34:16
**prepared** 21:9; 35:10;
36:2, 21; 42:1
**preparing** 15:14; 21:18;
22:3; 34:18; 37:2, 8; 40:12
**prescribed** 48:12, 13;
49:6; 59:14
**prescription** 48:6; 49:1,
9, 10; 61:11; 63:1
**present** 38:7
**pretty** 13:7; 31:8
**previously** 8:1; 29:20
**principal** 41:9
**prior** 31:7; 37:4, 22; 55:21
**prison** 54:2, 11
**probably** 10:8; 25:8;
26:19
**proceeding** 5:7; 8:5
**PROCEEDINGS** 3:1;
23:19
**process** 35:17; 45:13;
47:7; 57:3, 5
**profess** 19:8
**professed** 42:17
**professional** 66:7
**program** 21:2, 4; 29:9,
14; 37:17; 38:14, 16
**project** 14:15; 39:21
**projects** 15:7; 23:6
**protect** 57:9
**public** 34:20; 37:3, 6
**pull** 62:1
**puppet** 58:7
**put** 17:13; 29:21; 30:12,

17; 34:15; 58:5; 63:16
**putting** 26:6; 27:4

## Q

**quietly** 32:22
**quite** 17:5
**quote** 19:17; 25:17

## R

**race** 9:17; 30:18; 40:19
**rather** 57:4
**reaction** 56:16
**read** 14:1; 28:9; 53:14;
55:9
**real** 51:8
**really** 14:4; 23:14; 26:18;
34:3; 50:4; 62:16, 16
**rearranging** 23:17
**reason** 23:17; 33:16;
45:17; 54:16; 56:8; 57:21;
62:8, 14
**reasons** 40:18, 22
**recap** 52:11
**received** 8:20; 11:13;
35:11; 51:18
**receiving** 6:9; 8:9
**record** 3:21; 10:6; 11:1;
38:6
**referenced** 27:8
**referring** 66:16
**refilled** 49:1, 3, 6
**refusing** 46:5
**regarding** 35:22
**regular** 33:3; 50:5
**reimbursed** 52:17, 20
**Reimbursement** 43:20
**relate** 4:15; 65:16
**relates** 45:14, 16
**relationship** 62:5
**relationships** 46:14
**released** 38:1; 46:11
**relief** 43:13
**relieve** 59:14
**religion** 9:17, 18; 15:20,
21; 16:8; 20:15; 34:17;
40:20; 41:9; 42:14
**religious** 17:2
**relying** 42:13
**remain** 7:12
**remember** 4:15; 8:15;
23:2; 28:10, 20, 21; 52:7
**remove** 12:4, 6; 30:6
**removed** 12:7; 29:11;
41:7
**removing** 41:10, 11
**rent** 46:2, 4
**reorganize** 25:17
**reorganizing** 25:6
**repeat** 57:7

**repeated** 41:8
**replace** 12:5
**report** 10:7; 19:13; 27:7;
28:16; 35:21; 55:10
**reported** 63:6
**representing** 3:6
**research** 15:15; 21:10,
22; 22:12, 13, 19, 22
**resignation** 55:5
**respect** 6:5
**respond** 38:17
**responsibilities** 14:1
**responsible** 11:19
**result** 8:18; 9:2; 64:8
**revisit** 24:14; 48:10
**right** 9:10; 10:3, 21;
11:15; 13:9; 19:17; 25:13;
41:11; 45:12; 51:13; 54:9;
60:12; 63:13; 66:9, 15
**rite** 19:6
**roadmap** 25:6; 42:1
**role** 29:13, 16
**room** 25:18; 26:4; 30:8;
32:1, 3, 6, 7, 10; 39:6;
54:6; 60:6, 7; 62:20

## S

**S** 7:7, 8
**Safari** 5:19, 20
**safety** 10:9
**salary** 42:21; 43:12; 53:4
**same** 26:6; 27:4; 29:4, 5;
30:18; 32:10, 19; 33:15;
45:1; 49:10
**sat** 28:9; 32:1, 5
**saved** 15:21; 16:5, 8;
17:7, 10, 12, 14, 15, 16;
18:1, 4, 5, 8, 9, 19; 19:4, 5,
9, 12, 18, 21; 20:5; 42:11,
13
**saw** 13:10; 49:5; 54:10;
64:10; 65:14
**saying** 7:22; 19:11; 20:8;
26:21; 36:4; 52:12; 57:4,
15; 62:18
**scan** 10:22; 53:13
**Scheduling** 15:13;
33:19; 40:11
**search** 50:6, 17, 22
**searching** 50:4
**second** 10:22; 11:18;
59:19
**secretariat** 55:12
**securing** 51:11
**seeing** 48:15; 65:16
**seeking** 49:20; 50:15
**send** 24:9
**sent** 26:20; 27:7; 28:16,
22; 57:3, 15
**sentence** 53:19
**September** 24:22; 46:1,
4; 59:7; 61:6, 7, 9; 62:19

**series** 4:12
**served** 53:16
**servers** 24:21; 25:1
**settle** 43:2
**settled** 7:9
**settlement** 6:20; 7:11,
15; 9:2; 42:22; 43:3
**seventh** 27:12
**several** 30:11; 65:13
**severance** 43:5, 6
**Severe** 44:15, 16; 58:15;
65:18
**severely** 53:21; 58:12
**shake** 3:22
**shock** 13:6; 39:11
**shortly** 50:3
**showing** 24:9
**sick** 55:21; 57:18
**signature** 11:6
**signed** 11:9, 12
**sinners** 19:7
**sit** 4:14; 34:2; 54:2; 57:5
**situation** 33:4; 50:9;
53:20, 21; 54:1, 13; 55:3;
61:5; 65:19
**slowed** 50:20, 21
**small** 6:13; 30:7; 31:4;
39:5, 8; 54:7, 8
**smoke** 17:7; 18:13
**Snyder** 3:12
**someone** 12:5; 57:5
**sometimes** 22:8
**somewhere** 7:3; 27:8
**sorry** 10:20; 20:1; 52:8;
56:3
**sort** 15:5, 12; 28:18; 39:2;
55:18; 61:19
**sought** 49:18; 50:1, 14
**sounds** 4:8
**speaking** 23:16, 18, 22;
28:11
**speaks** 32:21
**special** 15:7; 19:16
**specialize** 52:4
**specific** 24:16; 31:13;
40:5; 60:8
**specifically** 40:7
**speculation** 34:8
**speeches** 15:15; 21:9,
18; 22:3, 9; 40:12
**speed** 34:7
**spoke** 5:3, 13; 57:10
**spoken** 23:3; 24:2; 33:3;
56:17, 18
**spread** 22:1
**Stacy** 12:22; 14:13; 16:2,
8; 18:8, 21; 20:8; 23:2, 4,
14, 19; 24:5, 9; 39:21
**staff** 13:22; 14:17; 15:10;
21:12; 38:1, 4; 41:22; 52:7
**stage** 43:4
**start** 4:11; 25:8; 47:20;
58:17; 59:1, 5

**started** 12:17; 21:15;
40:10; 59:2, 6; 61:6; 62:18
**starts** 11:18; 20:21
**state** 15:19; 29:8; 34:12;
37:21
**stated** 16:8; 40:19
**statement** 16:1, 2; 23:9;
24:16
**statements** 55:11
**States** 3:7; 11:18; 15:20;
53:20
**stating** 28:17
**status** 27:6; 28:16
**stay** 7:18; 13:9; 40:1; 53:1
**stayed** 62:14
**still** 13:6; 39:14
**stood** 14:10; 33:5
**stopped** 23:18, 21; 63:14
**stories** 55:11
**story** 16:19, 20
**stuff** 14:7; 18:14; 24:11;
26:22; 40:4
**subject** 35:21
**sudden** 36:7; 54:15
**suddenly** 33:10
**sue** 6:4
**sued** 5:3, 11; 6:8; 8:1
**suffering** 58:14
**suit** 5:14; 6:6, 19, 21;
7:20, 22; 8:8
**sum** 43:7, 8; 53:3
**summoned** 42:2
**supervisor** 12:10, 15;
58:6
**supportive** 23:14
**suppose** 18:19
**supposed** 36:11, 13;
57:16
**sure** 13:12; 24:13; 27:14;
29:22; 38:5; 47:14, 14;
50:13
**sworn** 4:8
**system** 28:19; 29:1; 42:3

## T

**tab** 10:15; 14:22; 27:10;
28:21; 29:4, 5
**tabs** 10:20; 26:7
**talk** 5:13; 42:18; 53:7;
57:21
**talking** 9:9; 30:16; 32:15;
57:20
**task** 27:5
**telling** 24:6; 59:21
**tells** 24:17
**temporary** 30:21; 33:9,
19; 51:12, 22
**terminated** 50:17, 19
**testified** 4:8; 5:6
**Thanksgiving** 13:2;
38:1; 40:2

**theirs** 42:14
**Thomas** 23:15, 17, 18; 34:17; 37:10
**thou** 19:6
**though** 19:8
**thought** 59:19
**Three** 6:13, 15; 26:8, 9, 12; 35:14; 43:5; 44:4, 8; 45:17; 56:18; 62:7
**three-day** 46:8
**timely** 36:21
**times** 48:19, 22
**title** 38:16
**titles** 55:12
**today** 3:9; 4:14
**together** 31:3, 3, 15, 17; 32:2, 6
**told** 13:8; 14:16; 16:9, 16, 17, 18, 19, 21, 22; 17:5, 6, 6; 18:8, 12; 23:2; 30:5; 35:4; 62:20
**took** 25:3; 26:7, 15; 39:2, 17, 22; 42:3, 5; 55:4, 8; 61:13
**total** 6:16, 17
**toy** 58:8
**tracking** 28:19; 29:1
**travel** 15:14; 21:8; 34:16; 35:2, 10, 12; 36:1, 2, 8, 8, 15, 21; 40:11
**treat** 60:20
**treated** 44:14; 54:22, 22; 59:17
**treatment** 59:2
**trigger** 62:1
**trust** 55:7
**trying** 3:20; 17:4
**Tuesday** 40:2
**turn** 17:6
**Twice** 49:2, 3
**two** 13:1, 13; 25:7; 33:8, 9; 35:14; 42:3; 49:11; 63:11, 12
**type** 41:10; 47:10; 66:6
**typist** 22:11



# U

**U** 56:9
**U.S** 3:14
**ugly** 56:8
**um-hmm** 4:1; 5:17, 21; 6:3; 7:17; 8:13; 48:4; 56:14; 64:16
**unbearable** 53:20, 22; 54:13, 20; 56:4; 65:19
**uncalled** 62:2
**under** 38:16; 53:1; 58:4; 65:17
**unemployment** 46:5
**unit** 29:9
**United** 3:7
**University** 44:6; 48:17;

---

49:6; 60:11
**unknown** 34:17
**unless** 31:9; 32:21
**unquote** 19:18; 25:17
**up** 12:11; 14:10; 16:11, 15; 25:2; 34:7; 39:17; 50:2; 55:10, 11, 20
**upon** 48:18
**upset** 13:7; 23:19
**use** 32:18; 41:4
**used** 17:7, 8; 18:5, 7, 13, 13, 13; 36:18; 37:15; 41:13; 58:7
**using** 18:4; 23:20



# V

**verify** 11:4
**versus** 3:13
**via** 24:9
**Virginia** 6:1, 2
**visit** 46:8; 49:16; 61:9

# W

**wait** 10:19; 59:19; 64:6
**waiving** 46:20
**wall** 54:9
**wants** 25:21; 36:7
**Washington** 44:6; 46:8; 60:11
**way** 16:7; 17:13; 29:21, 22; 30:12; 36:4, 11, 12; 54:21; 55:6; 59:2, 16
**web** 28:9
**week** 25:7, 9; 26:19, 20; 27:13, 14; 49:22; 50:15; 56:3; 59:7; 61:2, 3, 4, 17, 18; 63:7
**weekday** 60:14
**weekly** 50:2
**weeks** 26:7, 8, 9, 13; 42:3, 5; 55:21; 63:11, 12
**weren't** 6:5
**What's** 17:16; 19:5; 33:17; 45:20
**Whereupon** 4:5; 66:20
**who's** 14:8; 30:1
**whoa** 64:6
**whole** 13:8; 47:6; 58:15
**wife** 33:12
**William** 23:15, 16, 18; 34:16
**window** 28:10; 54:10
**without** 29:12
**witness** 4:7
**witnessed** 13:8
**word** 18:4, 5, 8; 19:6; 41:4, 13; 55:1; 60:1
**words** 58:10
**work** 13:6; 27:22; 29:2; 50:5; 54:1; 59:16; 60:22;

---



61:1, 18, 18; 63:6; 65:19
**worked** 8:12; 36:12
**working** 14:14; 38:3; 39:21
**workload** 35:6
**World** 5:19, 20
**worse** 54:5
**worth** 63:11
**written** 11:13

# Y

**year's** 42:21; 43:12; 53:4
**years** 45:17; 62:7
**yell** 32:18

Exhibit 5

# AFFIDAVIT

Location: Washington, D.C.

1

2       I, Darren Franklin, solemnly swear to the truth of the following statement which is in

3   response to questions posed by Robert Walker, Equal Employment Opportunity (EEO)

4   Investigator, F & W Associates, and provide information pertaining to the formal complaint of

5   discrimination, filed by Gary Christian, against the U. S. Interagency Council on Homelessness,

6   Complaint Number 06-NCR-WAL-GEC-1.   The following claim has been accepted for

7   investigation:

8
9               Whether he was subjected to discrimination based on his race (Caucasian) and
10              religion (Catholic) when on November 23, 2005:
11
12              He relinquished his job duties and was replaced by a contract/ employee.
13

14      My name is Darren Gerone Franklin.  My race is African-American, and my religion is

15   Baptist.  My title is Administrative Officer.  USICH uses the GS pay scale to determine pay rates

16   for its employee.  All USICH positions are administratively determined or AD, and are not GS

17   positions.  AD means that the head of the agency sets pay and determines positions based on an

18   individual's education, experience, knowledge, skills and abilities.  My pay level would be the

19   equivalent of a GS -15.  Neither the Complainant's previous position nor his present position are

20   GS positions.  His present and past position are both at the pay level equivalent of a GS 11 or 12.

21   There was no change in the Complainant's pay level or job series as a result of the change in his

22   job title and job duties.

23      I have been in my position since May, 2005.  I work for the U.S. Interagency Council on

24   Homelessness, Federal Center Southwest, 409 3rd Street, S. W., Suite 310, Washington, D. C.

1    20024. I have worked at this duty station and for USICH since May, 2005.

2        My first-level supervisor is Philip F. Mangano, Executive Director. I do not have a

3    second-level supervisor.

4        I am the Complainant's immediate supervisor. I have been his immediate supervisor

5    since his change of duties in November 2005.

6        The Complainant's former position was titled Program Analyst. Now, since the

7    reorganization, there are three Staff Assistants, including the Complainant, and no Program

8    Analysts. The other Staff Assistants are Stacy Pickstock, African-American, and William

9    Thomas, Caucasian. I don't know their religion. Their positions did not change in November,

10   2005, when the Complainant's position changed, but their positions did change or develop as

11   part of the agency's reorganization at other points during 2005.

12       I did not demote the Complainant as he alleged, nor demoted him, *de facto*, by assigning

13   him new duties as a Staff Assistant, as he alleges. In fact his current position has even more

14   autonomy and greater substantive responsibility than his former position. He has not been

15   demoted in any way. He has been assigned new duties. Further, there was no loss in pay or

16   tenure, or anything that would affect his benefits in any way. As I explained earlier, neither

17   position is GS graded. We use the GS pay scale as a basis for setting pay. Based on the work

18   the Complainant has done since he has been with the Council, he never performed Program

19   Analyst work. He never analyzed any programs nor made any recommendations for program

20   changes or improvements as a result of any analysis, which is the primary duty of a Program

21   Analyst as the nature of this job in federal service is generally defined.

Initials *DGP*                Page 2 of 7

1        The change in his responsibilities came as a fact of the Council's evolution as an

2    independent federal agency, and the need to best utilize its staff.  Part of my responsibilities is to

3    ensure that agency runs as efficiently as possible and to utilize staff effectively.  I, along with the

4    Deputy Director, Mary Ellen Hombs (Caucasian, religion not known) and the Executive Director

5    Philip Mangano (Caucasian, religion not known) reviewed how USICH did its work, looked at

6    what skills, knowledge and abilities the staff possessed, and reviewed how the agency need to

7    improve its work processes in order to run most effectively and efficiently, as required by law.

8    We all felt that Mr. Christian could be better utilized in a new and different capacity.  Before the

9    change in his duties, he was working with the Executive Director and other staff, typing

10    speeches, scheduling hotel and flight reservations, and providing administrative and clerical

11    support for the Executive Director and the office.   After November 23, 2005, as a Staff

12    Assistant, he is primarily responsible for managing the agency's official records, ensuring that

13    both paper and electronic are properly maintained to ultimately prepare them for official

14    archival, once the agency's work is completed.  He continues to type speeches for the Executive

15    Director and takes on other special projects as necessary.  These activities equate to a full-time

16    job, and a 40 hour workweek.  Before the Complainant's reassignment, USICH did not have an

17    Executive Secretariat function, and we wanted to move towards having all agency

18    correspondence and records handled by one individual and having that person responsible for

19    archiving all of those official agency records.  The Complainant's current position encompasses

20    document management to include the  receipt, control, and tracking of correspondence and other

21    written and electronic documents, including any classified material that are addressed to the

22    Chairman, which is the Secretary of HUD, or any other USICH council member, most of which

1    are cabinet level officials, the Executive Director and staff.  The Complainant's position is also

2    the focal point for the dissemination of information, particularly electronic information for

3    USICH.  The Complainant serves as the point of contact for USICH records repository for all

4    official documents for the Chairman, USICH council members and the Executive Director and

5    staff.

6

7           I don't agree with the Complainant's statement that he has nothing to do after the change

8    in his duties.  He is responsible for the "executive secretariat" type of functions for the agency.

9    Additionally, since his duties are a new function for the agency, he is responsible for researching

10    electronic recordation, tracking and archival products available to USICH as it implements this

11    new initiative.  This work includes contacts with vendors, meeting with them to discuss agency

12    requirements, and making recommendations to USICH management on its IT options.  This

13    function also includes contacts with other federal agencies' Executive Secretariat departments to

14    research what the IT, software, processes and other requirements are for federal agencies.  If the

15    Complainant had taken initiative in his new duties, his work could include meeting with the

16    Executive Secretariat representatives of other federal agencies, training in this area, sites visits to

17    the official federal archives in College Park, MD, meeting with various vendors that provide

18    electronic document tracking and archiving tools, etc.  Mr. Christian has in effect refused to

19    perform is new duties by not taking the initiative required to be successful in the new duties that

20    have been assigned to him.  Mr. Christian only does work (that is his responsibility since he's

21    been reassigned) when I tell him to do something specific because he does not want to do the

22    work.



1    Before his reassignment occurred, I explained to Mr. Christian that the agency, as an

2    organization, is still evolving. With the concurrence of the Executive Director, Mr. Mangano

3    (Caucasian, religion unknown) and the Deputy Director, Ms. Hombs, (Caucasian, religion

4    unknown) the decision to reorganize USICH's staff was made. The Complainant's job was not

5    the only one that changed. There were other restructuring changes starting in the summer of

6    2005. For example, Stacy Pickstock took on the travel voucher reimbursement process, in

7    addition to what she was doing before. She also is now responsible for property management

8    inventory and for performing periodic checks of property required by auditors. Additionally, as

9    a part of USICH's reorganization, some of Ms. Pickstock's (African American, religion not

10   known) duties were shifted from her and given to William Thomas (Caucasian, religion not

11   known) who was hired in October 2005, e.g. preparing the agency's official weekly newsletter

12   and certain briefing materials for the Executive Director. Mr. Christian formerly assisted with

13   the transference of the briefing material from the staff who prepared them to the Executive

14   Director. Staff prepared substantive briefing materials and Mr. Christian put them in a notebook

15   for the Executive Director to take with him on travel. Cynthia Miller, African-American

16   (religion unknown), now performs this task.

17       In response to the Complainants allegations that work was taken from him and given to a

18   contractor, this is my response. In early November or late October of 2005, as part of USICH's

19   compliance with federal rules and regulations, I required travel authorizations to be completed

20   prior to travel arrangements being made for staff. The Complainant felt he did not have time to

21   do this. To free up his time so that he could fulfill this requirement, I shifted some of his

22   workload to Ms. Miller and Mr. Thomas. This had nothing to do with his job reassignment that

Initials _____

1    occurred later. This action happened after my telling him that this work is required–travel

2    authorizations–and when we are audited accurate records had to be in place. The Complainant

3    and I went back and forth numerous times on this subject, with Mr. Christian's responses

4    repeatedly resulting in the fact that he wouldn't comply with this requirement. Mr. Christian

5    said he did not have time to do it and that I was harassing him. I told him that I would get him

6    help. At the time, Ms. Miller was already here for about several months, and was a payrolled

7    employee, not a contractor. I shifted to her the handling of the Executive Director's invitations

8    to speak, and shifted other things to William Thomas (Caucasian, religion not known) so that Mr.

9    Christian could fu!fill his job requirements.

10    Mr. Christian's race was never a factor in the decision to reassign him other duties. Mr.

11    Christian's religion was never the basis for the change in his duties. I never discussed religion

12    with Mr. Christian, ever. I have never discussed with Mr. Christian or anyone else at USICH

13    anything remotely near the statement that Ms. Miller and I are saved and others at the Council

14    are not. Before the filing of this complaint, I did not know the Complainant's or any other

15    USICH employee's religion.

1          I have read this statement consisting of 7 pages, and I have made all the necessary

2    changes, additions or corrections, and I have signed or initialed every page.

3          I hereby declare under penalty or perjury that the foregoing statement is true, correct, and

4    complete to the best of my knowledge and belief.

5    Signature: _____

6    Date: _____4/ 13/ 2006_____

7    Subscribed and sworn to before me this 13th day of April_____ 2006

8

9

10   EEO Investigator, F & W Associates

11   Or

12   _____        ✓ (witness)

13   Notary Public

14   My commission expires:_____

15

16

17

Initials _____        Page 7 of 7

Exhibit 6

## AFFIDAVIT

Location: Washington, D. C.

1     I, Cynthia Miller, solemnly swear to the truth of the following statement which is

2     in response to questions posed by Robert Walker, Equal Employment Opportunity

3     (EEO) Investigator, F & W Associates, and provides information pertaining to the

4     formal complaint of discrimination, filed by Gary Christian, against the U. S.

5     Interagency Council on Homelessness, Complaint Number 06-NCR-WAL-GEC-1. The

6     following claim has been accepted for investigation:

7     Whether he was subjected to discrimination based on his race (Caucasian) and religion

8     (Catholic) when on November 23, 2005:

9     He relinquished his job duties and was replaced by a contract/ employee.

10     My full name is Cynthia Miller. My race is African-American. My religion is Apostolic.

11     I work for the U. S. Interagency Council on Homelessness, 409 Third Street, S. W., Room 310,

12     Washington, D. C. 20024. My title and grade are Executive Assistant, Grade - 11.

13     My first-line supervisor is Darren Franklin, Administrative Officer. My second-level

14     supervisor is Philip F. Mangano, Executive Director.

15     I first worked for the council in September 2005. I was a temporary employee. The

16     position was Executive Assistant, that would turn to permanent position. I became a permanent

17     employee in October 2005. At that time, my duties were to answer the phones and help out on

18     projects as assigned. Basically, as a temporary employee, you are so that management can

19     observe how you perform. I would take on more duties as assigned. Because my background

*C M*

1   was in membership, they knew that I was familiar with conferences–registration. I was assigned

2   conference related projects to complete.

3       I took on some duties that were performed by Gary Christian. I assumed responsibility

4   for travel authorizations and the Executive Director's briefing book. I don't remember a specific

5   meeting on November 23, 2005, but a previous meeting with Mr. Franklin, Mr. Christian,

6   Ms. Hombs, and Mr. Thomas in which duties were assigned to me and Mr. Thomas. I was told

7   by the Deputy Director that I would be assuming these duties. I was told there was a shift in

8   duties. No one told me that I was given these duties to relieve Mr. Christian of those duties. I did

9   not get into office politics. I was not aware what may have been going on with him.

10      I don't know of any facts that would show that the decision to give me these

11  responsibilities was related to my race or religion. I was given the duties by the Deputy Director,

12  who is Caucasian. I know for a fact that my present position was not given to me because of my

13  race and religion.

*C M*

1      I have read this statement consisting of __2__ pages, and I have made all the necessary

2    changes, additions or corrections, and I have signed or initialed every page.

3      I hereby declare under penalty or perjury that the foregoing statement is true, correct, and

4    complete to the best of my knowledge and belief.

5    Signature: _Cynthia L. Miller_

6    Date: _5/8/06_

7    Subscribed and sworn to before me this _8_ day of _MAY_ 2006

8

9    _____

10   EEO Investigator, F & W Associates

11   Or

12   _____ 5/8/06

13   Notary Public

14   My commission expires: _____

15

16

17

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

`

| | | |
|---|---|---|
| **GARY CHRISTIAN,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 07-698(JR)** |
| | ) | |
| **PHILIP MANGANO,** | ) | |
| **Executive Director** | ) | |
| **U.S. Interagency Council on Homelessnes** | ) | |
| **Defendant.** | ) | |
| **_____** | ) | |

**ORDER**

UPON CONSIDERATION of Defendant's Motion for Summary Judgment,

memorandum, and accompanying documents, any opposition by Plaintiff, reply, and the entire

record herein, it is on this ___ day of _____, 2008,

ORDERED that Defendant's Motion for Summary Judgment is Granted.

_____

United States District Judge